*250 Justice Scalia
delivered the opinion of the Court.
We consider whether Ex parte Young, 209 U. S. 123 (1908), allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same State.
I
A
The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act), 114 Stat. 1677, 42 U. S. C. § 15001 et seq., offers States federal money to improve community services, such as medical care and job training, for individuals with developmental disabilities. See §§ 15023(a), 15024. As a condition of that funding, a State must establish a protection and advocacy (P&A) system “to protect and advocate the rights of individuals with developmental disabilities.” § 15043(a)(1). The P&A system receives separate federal funds, paid to it directly. § 15042(a) and (b). A second federal law, the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act), 100 Stat. 478, 42 U. S. C. § 10801 et seq., increases that separate funding and extends the mission of P&A systems to include the mentally ill. §§10802(2), 10803, 10827. At present, every State accepts funds under these statutes.
Under the DD and PAIMI Acts, a P&A system must have certain powers. The system “shall . . . have the authority to investigate incidents of abuse and neglect... if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.” § 15043(a)(2)(B); § 10805(a)(1)(A). Subject to certain statutory requirements, it must be given access to “all records” of individuals who *251 may have been abused, see § 15043(a)(2)(I)(iii)(II); § 10805(a) (4)(B)(iii), as well as “other records that are relevant to conducting an investigation,” § 15043(a)(2)(J)(i). The Acts also require that a P&A system have authority to “pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of” its charges. § 15043(a) (2)(A)(i); see § 10805(a)(1)(B). And in addition to pressing its own rights, a P&A system may “pursue administrative, legal, and other remedies on behalf of” those it protects. § 10805(a)(1)(C); see § 15044(b).
A participating State is free to appoint either a state agency or a private nonprofit entity as its P&A system. § 15044(a); § 10805(c)(1)(B). But in either case, the designated entity must have certain structural features that ensure its independence from the State’s government. The DD Aet prohibits the Governor from appointing more than one-third of the members of the system’s governing board, § 15044(a)(2), and restricts the State’s ability to impose hiring freezes or other measures that would impair the system’s ability to carry out its mission, § 15043(a)(2)(E). Once a State designates an entity as its P&A system, it may not change its selection without “good cause.” § 15043(a)(4)(A).
Virginia is one of just eight States that have designated a government entity as their P&A system. The Virginia Office for Protection and Advocacy (VOPA) is an “independent state agency.” Va. Code Ann. § 51.5-39.2(A) (Lexis 2009). Its board consists of eleven “nonlegislative citizen members,” of whom only three are appointed by the Governor. § 51.5-39.2(B). The remaining eight are appointed by components of the legislature: five by the Speaker of the House of Delegates, and three by the Senate Committee on Rules. Ibid. VOPA itself nominates candidates for consideration, and the statute instructs the appointing officials that they “shall seriously consider the persons nominated and appoint such persons whenever feasible.” Ibid,. Board members serve for fixed terms and are removable only by a court and only for *252 specified reasons. See § 51.5-39.2(0 and (F); § 24.2-233 and 234 (Lexis 2006).
VOPA enjoys authority to litigate free of executive-branch oversight. It operates independently of the Attorney General of Virginia and employs its own lawyers, who are statutorily authorized to sue on VOPA’s behalf. § 51.5-39.2(A); § 2.2-510(5) (Lexis 2008). And Virginia law specifically empowers VOPA to “initiate any proceedings to secure the rights” of disabled individuals. § 51.5-39.2(A).
B
In 2006, VOPA opened an investigation into the deaths of two patients and injuries to a third at state-run mental hospitals. It asked respondents — state officials in charge of those institutions — to produce any records related to risk-management or mortality reviews conducted by the hospitals with respect to those patients. Respondents refused, asserting that the records were protected by a state-law privilege shielding medical peer-review materials from disclosure.
VOPA then brought this action in the United States District Court for the Eastern District of Virginia, alleging that the DD and PAIMI Acts entitled it to the peer-review records, notwithstanding any state-law privilege that might apply. It sought a declaration that respondents’ refusal to produce the records violated the DD and PAIMI Acts, along with an injunction requiring respondents to provide access to the records and refrain in the future from interfering with VOPA’s right of access to them. Respondents moved to dismiss the action on the grounds that they are immune from suit under the Eleventh Amendment. The District Court denied the motion. In its view, the suit was permitted by the doctrine of Ex parte Young, which normally allows federal courts to award prospective relief against state officials for violations of federal law. Virginia v. Reinhard, 2008 WL 2795940, *6 (ED Va., July 18, 2008).
*253 The Court of Appeals reversed. Virginia v. Reinhard, 568 P. 3d 110 (CA4 2009). Believing VOPA’s lawsuit to be an “intramural contest” that “encroaches more severely on the dignity and sovereignty of the states than an Ex parte Young action brought by a private plaintiff,” the Court of Appeals concluded it was not authorized by that case. Id., at 119-120 (internal quotation marks omitted).
We granted certiorari. 561 U. S. 1005 (2010).
II
A
Sovereign immunity is the privilege of the sovereign not to be sued without its consent. The language of the Eleventh Amendment[1] only eliminates the basis for our judgment in the famous ease of Chisholm v. Georgia, 2 Dall. 419 (1793), which involved a suit against a State by a noncitizen of the State. Since Hans v. Louisiana, 134 U. S. 1 (1890), however, we have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article Ill’s jurisdictional grant. Blatchford v. Native Village of Noatak, 501 U. S. 775, 779 (1991); see Pennhurst State School and Hospital v. Halderman, 465 U. S. 89, 98 (1984). Our cases hold that the States have retained their traditional immunity from suit, “except as altered by the plan of the Convention or certain constitutional amendments.” Alden v. Maine, 527 U. S. 706, 713 (1999). A State may waive its sovereign immunity at its pleasure, College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U. S. 666, 675-676 (1999), and in some circumstances Congress *254 may abrogate it by appropriate legislation.[2] But absent waiver or valid abrogation, federal courts may not entertain a private person’s suit against a State.
B
In Ex parte Young, 209 U. S. 123, we established an important limit on the sovereign-immunity principle. That case involved a challenge to a Minnesota law reducing the freight rates that railroads could charge. A railroad shareholder claimed that the new rates were unconstitutionally confiscatory, and obtained a federal injunction against Edward Young, the Attorney General of Minnesota, forbidding him in his official capacity to enforce the state law. Perkins v. Northern Pacific R. Co., 155 F. 445 (CC Minn. 1907). When Young violated the injunction by initiating an enforcement action in state court, the Circuit Court held him in contempt and committed him to federal custody. In his habeas corpus application in this Court, Young challenged his confinement by arguing that Minnesota’s sovereign immunity deprived the federal court of jurisdiction to enjoin him from performing his official duties.
We disagreed. We explained that because an unconstitutional legislative enactment is “void,” a state official who enforces that law “comes into conflict with the superior authority of [the] Constitution,” and therefore is “stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.” 209 U. S., at 159-160.
This doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as *255 necessary to “permit the federal courts to vindicate federal rights.” Pennhurst, 465 U. S., at 105. It rests on the premise — less delicately called a “fiction,” id., at 114, n. 25—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply “when ‘the state is the real, substantial party in interest,’ ” id., at 101 (quoting Ford Motor Co. v. Department of Treasury of Ind., 323 U. S. 459, 464 (1945)), as when the “‘judgment sought would expend itself on the public treasury or domain, or interfere with public administration,’ ” 465 U. S., at 101, n. 11 (quoting Dugan v. Rank, 372 U. S. 609, 620 (1963)).
C
This case requires us to decide how to apply the Ex parte Young doctrine to a suit brought by an independent state agency claiming to possess federal rights. Although we have never encountered such a suit before, we are satisfied that entertaining VOPA’s action is consistent with our precedents and does not offend the distinctive interests protected by sovereign immunity.
1
In Verizon Md. Inc. v. Public Serv. Comm’n of Md., 535 U. S. 635 (2002), we held that “[i]n determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a ‘straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.’” Id., at 645 (quoting Idaho v. Coeur d’Alene Tribe of Idaho, 521U. S. 261, 296 (1997) (O’Connor, J., concurring in part and concurring in judgment)). There is no doubt VOPA’s suit satisfies that straightforward inquiry. It alleges that respondents’ refusal to produce the requested medical records violates federal law; and it seeks an injunction requiring the production of the records, which would *256 prospectively abate the alleged violation. Respondents concede that were VOPA a private organization rather than a state agency, the doctrine would permit this action to proceed.[3]
We see no reason for a different result here. Although respondents argue that VOPA’s status as a state agency changes the calculus, there is no warrant in our cases for making the validity of an Ex parte Young action turn on the identity of the plaintiff. To be sure, we have been willing to police abuses of the doctrine that threaten to evade sovereign immunity. To do otherwise “would be to adhere to an empty formalism.” Coeur d’Alene Tribe, supra, at 270. But (as the dissent concedes, post, at 273 (opinion of Roberts, C. J.)) the limits we have recognized reflect the principle that the “general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought,” Pennhurst, supra, at 107, not who is bringing the lawsuit. Thus, Ex parte Young cannot be used to obtain an injunction requiring the payment of funds from the State’s *257 treasury, see Edelman v. Jordan, 415 U. S. 651, 666 (1974); or an order for specific performance of a State’s contract, see id., at 666-667; In re Ayers, 123 U. S. 443 (1887).
Coeur d’Alene Tribe, on which respondents heavily rely, is an application of this principle. There we refused to allow an Indian Tribe to use Ex parte Young to obtain injunctive and declaratory relief establishing its exclusive right to the use and enjoyment of certain submerged lands in Idaho and the invalidity of all state statutes and regulations governing that land. 521 U. S., at 265. We determined that the suit was “the functional equivalent of” “a quiet title suit against Idaho,” would “extinguish ... the State’s control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory,” and thus was barred by sovereign immunity. Id., at 281, 282.
Respondents have advanced no argument that the relief sought in this case threatens any similar invasion of Virginia’s sovereignty. Indeed, they concede that the very injunction VOPA requests could properly be awarded by a federal court at the instance of a private P&A system.
2
Respondents and the dissent argue that entertaining VOPA’s lawsuit in a federal forum would nevertheless infringe Virginia’s sovereign interests because it diminishes the dignity of a State for a federal court to adjudicate a dispute between its components. See Brief for Respondents 23-26; post, at 269-273 (arguing that “‘special sovereignty interests’ ” bar VOPA’s lawsuit (quoting Coeur d’Alene Tribe, supra, at 281)). We disagree. As an initial matter, we do not understand how a State’s stature could be diminished to any greater degree when its own agency polices its officers’ compliance with their federal obligations, than when a private person hales those officers into federal court for *258 that same purpose — something everyone agrees is proper.[4] And in this case, of course, VOPA’s power to sue state officials is a consequence of Virginia’s own decision to establish a public, rather than a private, P&A system. We fail to perceive what Eleventh Amendment indignity is visited on the Commonwealth when, by operation of its own laws, VOPA is admitted to federal court as a plaintiff.[5]
But even if it were true that the State’s dignity were offended in some way by the maintenance of this action in federal court, that would not prove respondents’ case. Denial of sovereign immunity, to be sure, offends the dignity of a State; but not every offense to the dignity of a State constitutes a denial of sovereign immunity. The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent. That effectively occurs, our cases reasonably conclude, when (for example) the object of the suit against a state officer is to reach funds in the state treasury or acquire state lands; it *259 does not occur just because the suit happens to be brought by another state agency. Respondents’ asserted dignitary harm is simply unconnected to the sovereign-immunity interest.
The dissent complains that applying Ex parte Young to this lawsuit divides Virginia against itself, since the opposing parties are both creatures of the Commonwealth. Post, at 271-272. Even if that were a distinctive consequence of letting this suit proceed in federal court, it would have nothing to do with the concern of sovereign immunity — whether the suit is against an unconsenting State, rather than against its officers. But it is not a consequence of the federal nature of the forum. The same result will follow if the federal claim is sued upon in state court, as the dissent would require. There also, “[wjhatever the decision in the litigation,... [t]he Commonwealth will win[, a]nd the Commonwealth will lose.” Post, at 272. Nor would sending the matter to state court even avoid the prospect that “a federal judge will resolve which part of the Commonwealth will prevail,” ibid., since the state-court loser could always ask tkis Court to review the matter by certiorari. (Or is that appeal also to be disallowed on grounds of sovereign immunity? But see Cohens v. Virginia, 6 Wheat. 264 (1821).)[6] And of course precisely the same thing would happen if respondents specifically waived their sovereign immunity objections in tkis very case. Yet no one would contend that despite the waiver, sovereign immunity forbade the suit. So also here: If, by reason of Ex parte Young, there has been no violation of *260 sovereign immunity, the prospect of a federal judge’s resolving VOPA’s dispute with respondents does not make it so.
We do not doubt, of course, that there are limits on the Federal Government’s power to affect the internal operations of a State. See, e. g., Printz v. United States, 521 U. S. 898 (1997) (Congress may not commandeer state officers); Coyle v. Smith, 221 U. S. 559, 579 (1911) (Congress may not dictate a State’s capital). But those limits must be found in some textual provision or structural premise of the Constitution. Additional limits cannot be smuggled in under the Eleventh Amendment by barring a suit in federal court that does not. violate the State’s sovereign immunity.[7]
3
A weightier objection, perhaps, is the relative novelty of this lawsuit. Respondents rightly observe that federal courts have not often encountered lawsuits brought by state agencies against other state officials. That does give us pause. Lack of historical precedent can indicate a constitutional infirmity, see, e. g., Free Enterprise Fund v. Public Company Accounting Oversight Bd., 561 U. S. 477, 505-506 (2010), and our sovereign-immunity decisions have traditionally warned against “ ‘anomalous and unheard-of proceedings or suits,’ ” Alden, 527 U. S., at 727 (quoting Hans, 134 U. S., at 18).
Novelty, however, is often the consequence of past constitutional doubts, but we have no reason to believe that is the case here. In order to invoke the Ex parte Young exception to sovereign immunity, a state agency needs two things: first, a federal right that it possesses against its parent State; and second, authority to sue other state officials to enforce that *261 right, free from any internal veto wielded by the state government. These conditions will rarely coincide — and at least the latter of them cannot exist without the consent of the State that created the agency and defined its powers. See post, at 264 (Kennedy, J., concurring). We are unaware that the necessary conditions have ever presented themselves except in connection with the DD and PAIMI Acts, and the parties have referred us to no examples.[8] Thus, the apparent novelty of this sort of suit does not at all suggest its unconstitutionality. In any event, we are satisfied, for the reasons we have explained, that — novelty notwithstanding — the principles undergirding the Ex parte Young doctrine support its application to actions of this kind.
* * #
Like the Court of Appeals, we are mindful of the central role autonomous States play in our federal system, and wary of approving new encroachments on their sovereignty. But we conclude no such encroachment is occasioned by straightforwardly applying Ex parte Young to allow this suit. It was Virginia law that created VOPA and gave it the power to sue state officials. In that circumstance, the Eleventh Amendment presents no obstacle to VOPA’s ability to invoke federal jurisdiction on the same terms as any other litigant.
We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.

 The Eleventh Amendment reads as follows:
“The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.”

 We have recognized that Congress may abrogate a State’s immunity when it acts under § 5 of the Fourteenth Amendment, Seminole Tribe of Fla. v. Florida, 517 U. S. 44, 59 (1996), but not when it aets under its original Article I authority to regulate commerce, id., at 65-66.

 The dissent is mistaken when it claims that applying the Verizon Maryland test would mean two of our cases were “wrongly decided.” Post, at 269 (opinion of Roberts, C. J.). We discuss the first of those cases, Coeur d’Alene Tribe, below. Infra, at 257. As for the second, Seminole Tribe, supra, it is inapposite. The reason we refused to permit suit to proceed in that case was that the Indian Gaming Regulatory Act created an alternative remedial scheme that would be undermined by permitting Ex parte Young suits; Congress, we said, had foreclosed recourse to the doctrine. See Seminole Tribe, supra, at 73-76.
Respondents now argue — for the first time in this litigation — that the DD and PAIMI Acts have the same effect here. We reject that suggestion. The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds — which are the chief statutory features respondents point to — does not demonstrate that Congress has “displayed an intent not to provide the ‘more complete and more immediate relief’ that would otherwise be available under Ex parte Young.” Verizon Maryland, 535 U. S., at 647 (quoting Seminole Tribe, supra, at 75).

 The dissent compares VOPA’s lawsuit to such indignities as “cannibalism” and “patricide,” since it is a greater “affront to someone’s dignity to be sued by a brother than to be sued by a stranger.” Post, at 274. We think the dissent’s principle of familial affront less than universally applicable, even with respect to real families, never mind governmental siblings. Most of us would probably prefer contesting a testamentary disposition with a relative to contesting it with a stranger. And confining one’s child to his room is called grounding, while confining a stranger’s child is called kidnaping. Jurisdiction over this case does not depend on which is the most apt comparison.

 The dissent accuses us of circular reasoning, because we “wrongly as-sum[e] [that] Virginia knew in advance the answer to the question presented in this case.” Ibid. That would be true if we were relying on the Commonwealth’s waiver of sovereign immunity. We are not. We rely upon Ex parte Young. We say that Virginia has only itself to blame for the position in which it finds itself, not because it consented to suit, but because it created a state entity to sue, instead of leaving the task to a private entity. It did not have to know that this would allow suit in federal court. Know or not know, Ex parte Young produces that result.

 The dissent agrees that because of the ‘“constitutional plan,’” post, at 272, n. 3 (quoting McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation, 496 U. S. 18, 30 (1990)), this Court can adjudicate disputes between state agencies without offending sovereign immunity. But explaining away exceptions to its theory does not advance the ball. It has not demonstrated that sovereign immunity has anything at all to say about federal courts’ adjudicating interagency disputes.

 We have no occasion to pass on other questions of federalism lurking in this case, such as whether the DD or PAIMI Acts are a proper exercise of Congress’s enumerated powers. As Justice Kennedy observes, whether the Acts run afoul of some other constitutional provision (i e., besides the Eleventh Amendment) “cannot be permitted to distort the antecedent question of jurisdiction.” Post, at 265 (concurring opinion).

We think greatly exaggerated the dissent’s concern that, “[g]iven the number of state agencies across the country that enjoy independent litigating authority,” today’s decision “could potentially lead to all sorts of litigation in federal courts addressing internal state government disputes.” Post, at 275. Such litigation cannot occur unless the state agency has been given a federal right of its own to vindicate (as VOPA alleges it has been given under the highly unusual statute at issue here).