16-2019-cv (L)
*Gingras v. Think Finance, Inc.*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2016

Argued: May 12, 2017
Decided: April 24, 2019

Docket Nos. 16-2019-cv (L); 16-2132-cv;
16-2135-cv; 16-2138-cv; 16-2140-cv (Con)

JESSICA GINGRAS, ON BEHALF OF HERSELF AND
OTHERS SIMILARLY SITUATED, ANGELA C.
GIVEN, ON BEHALF OF HERSELF AND OTHERS
SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

*v.*

THINK FINANCE, INC., TC LOAN SERVICE, LLC,
KENNETH E. REES, FORMER PRESIDENT AND
CHIEF EXECUTIVE OFFICER AND CHAIRMAN OF
THE BOARD OF THINK FINANCE, TC DECISION
SCIENCES, LLC, TAILWIND MARKETING, LLC,
SEQUOIA CAPITAL OPERATIONS, LLC,
TECHNOLOGY CROSSOVER VENTURES, JOEL
ROSETTE, OFFICIAL CAPACITY AS CHIEF
EXECUTIVE OFFICER OF PLAIN GREEN, TED
WHITFORD, OFFICIAL CAPACITY AS A MEMBER
OF PLAIN GREEN'S BOARD OF DIRECTORS, TIM
MCINERNEY,

*Defendants-Appellants.*

Appeal from the United States District Court
for the District of Vermont
No. 15-cv-101 – Geoffrey W. Crawford, *Judge*.

Before:      LEVAL, HALL, and CHIN, *Circuit Judges*.

Plaintiffs Jessica Gingras and Angela C. Given borrowed money from Plain Green, LLC, an online lending operation owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Montana. The terms of their loan agreements provide for interest rates well in excess of caps imposed by Vermont law. Gingras and Given sued, alleging violations of Vermont and federal law. They seek an injunction against tribal officers in charge of Plain Green and an award of money damages against other Defendants.

Some Defendants moved to dismiss, arguing that tribal sovereign immunity barred the suit. All Defendants moved to compel arbitration under the terms of the agreements. The district court (Geoffrey W. Crawford, *Judge*) denied both motions. We hold that tribal sovereign immunity does not bar this suit because Plaintiffs may sue tribal officers under a theory analogous to *Ex parte Young* for prospective, injunctive relief based on violations of state and substantive federal law occurring off of tribal lands. We further hold that the arbitration clauses of the loan agreements are unenforceable and unconscionable.

AFFIRMED.

COLLEEN SINZDAK, Hogan Lovells US LLP, Washington, DC (Morgan L. Goodspeed, Neal Kumar Katyal, Hogan Lovells US LLP, Washington, DC; Richard J. Zack, Matthew B. Homberger, Pepper Hamilton LLP, Philadelphia, PA, *on the brief*), *for Defendants-Appellants Joel Rosette, Ted Whitford, and Tim McInerney*.

LEWIS S. WIENER, Sutherland Asbill & Brennan LLP, Washington, DC (Kymberly Kochis, Sutherland Asbill & Brennan LLP, New York, NY; Ritchie E. Berger, Dinse Knapp McAndrew, Burlington, VT; Stephen D. Hibbard, Jones Day, San Francisco, CA; Todd R. Geremia, Jones Day, New York, NY;

Stephen D. Ellis, Ellis Boxer & Blake PLLC, Springfield, VT; Richard L. Scheff, David F. Herman, Montgomery McCracken Walker & Rhoads LLP, Philadelphia, PA; Thomas Hefferon, Sabrina Rose-Smith, Matthew Sheldon, Goodwin Procter LLP, Washington, DC, *on the brief*), *for Defendants-Appellants Think Finance, Inc., TC Decision Sciences, LLC, Tailwind Marketing, LLC, TC Loan Service, LLC, Technology Crossover Ventures, Kenneth E. Rees, and Sequoia Capital Operations, LLC*.

MATTHEW B. BYRNE, Gravel & Shea PC, Burlington, VT (Kathleen M. Donovan-Maher, Steven J. Buttacavoli, Anne F. O'Berry, Steven L. Groopman, Berman DeValerio, Boston, MA, *on the brief*), *for Plaintiffs-Appellees*.

Jeffrey R. White, Julie Braman Kane, American Association for Justice, Washington, DC, as *amicus curiae* in support of Plaintiffs-Appellees.

Scott L. Nelson, Allison M. Zieve, Public Citizen Litigation Group, Public Citizen, Inc., Washington, DC, as *amicus curiae* in support of Plaintiffs-Appellees.

HALL, *Circuit Judge*:

The federal government and many states have laws designed to protect consumers against predatory lending practices. In this case, we must determine what happens when those laws conflict with the off-reservation commercial activities of Indian tribes. In so doing, we probe the boundaries of tribal sovereign immunity and hold that, notwithstanding tribal sovereign immunity, federal courts may entertain suits against tribal officers in their

3

official capacities seeking prospective, injunctive relief prohibiting off-reservation conduct that violates state and substantive federal law. We also consider the specific lending agreements between these Plaintiffs and these Defendants and hold that the agreements' arbitration clauses are unenforceable and unconscionable.

I.

Payday loans are ostensibly short-term cash advances for people who face unexpected obligations or emergencies. The loans are typically for small sums that are to be repaid quickly—in anywhere from several weeks to a year. "Typically, online lenders charge fees and interest that, when annualized, result in interest rates far in excess of legal limits or typical borrowing rates, often exceeding 300%, 500%, or even 1,000%." Vermont Attorney General's Office, *Illegal Lending: Facts and Figures*, at 1 (Apr. 2014). Many states endeavored to curb such lending practices through usury laws that set caps on interest rates. For example, Vermont laws prescribe a maximum interest rate of 24% per annum. *See* Vt. Stat. Ann. tit. 9, § 41a.

A.

This suit involves payday loans made by Plain Green, LLC, an online lending operation, which holds itself out as a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana." J. App. 150. The borrowers are Plaintiffs-Appellees Jessica Gingras and Angela Given, who are Vermont residents. In July 2011, Gingras

4

borrowed $1,050 at an interest rate of 198.17% per annum. She repaid that loan and borrowed an additional $2,900 a year later, this time with an interest rate of 371.82%. She has not repaid the second loan. Also in July 2011, Given borrowed $1,250 at a rate of 198.45%. Given paid off that loan in July 2012 and, within a few days of repayment, took out another loan for $2,000 at a rate of 159.46%. She also borrowed $250 in May 2013 at a rate of 376.13%, which she repaid quickly, and in July 2013 borrowed $3,000 at a rate of 59.83%. Given has not repaid the most recent loan.

To receive their loans, Gingras and Given were required to sign loan agreements. Those loan agreements provide for arbitration in the event of a dispute between the borrower and Plain Green. One such provision is a delegation clause whereby the parties agree that "any Dispute . . . will be resolved by arbitration in accordance with Chippewa Cree tribal law." *Id.* 114–15. The agreement defines a "Dispute" as "any controversy or claim between" the borrower and the lender, "based on a tribal, federal or state constitution, statute, ordinance, regulation, or common law." *Id.* 115. "Dispute" includes "any issue concerning the validity, enforceability, or scope" of the loan agreement itself or the arbitration provision specifically. *Id.* A separate provision of the agreement vests authority to decide the validity of a class action lawsuit waiver and class-wide arbitration waivers in Chippewa Cree tribal court, not in an arbitrator. *Id.* 265.

5

The loan agreements also provide that Chippewa Cree tribal law governs the loan agreement and any dispute arising under it. An arbitrator, whom the borrower may select from the American Arbitration Association ("AAA") or JAMS, "shall apply Tribal Law" and any arbitral award must "be supported by substantial evidence and must be consistent with [the loan agreement] and Tribal Law." *Id.* Chippewa Cree tribal courts are empowered to set aside the arbitrator's award if it does not comply with tribal law. *See id.*

The agreements' command to apply tribal law also includes provisions stating "[n]either this Agreement nor the Lender is subject to the laws of any state of the United States," *id.* 263, and the agreements are "subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe of the Rocky Boy Indian Reservation" such that "no other state or federal law or regulation shall apply," *id.* 258. To the extent that AAA or JAMS policies and procedures conflict with tribal law, tribal law prevails.

The loan agreements allow borrowers to opt out of arbitration, but only if they exercise that option within sixty days of receiving the loan. If a borrower opts out, the agreements provide that their only recourse is to sue under tribal law in tribal courts. Neither Gingras nor Given opted out.

B.

Gingras and Given allege that the loan agreements violate Vermont and federal law. The loans originated from Plain Green, LLC. Plain Green's Chief Executive Officer is Defendant Joel Rosette; two members of Plain Green's

Board of Directors, Ted Whitford and Tim McInerney, are also defendants. Gingras and Given sued all three, whom we refer to as the Tribal Defendants, in their official capacities for prospective declaratory and injunctive relief.

The suit also names as defendants Think Finance, Inc. and its former President, Chief Executive Officer, and Chairman of the Board, Kenneth Rees. Plain Green employs Think Finance and its subsidiaries, Defendants TC Decision Sciences, LLC, Tailwind Marketing, LLC, and TC Loan Service, LLC, to service Plain Green loans. Defendants Sequoia Capital Operations, LLC and Technology Crossover Ventures provide funding for the lending operation.

Plaintiffs allege that Think Finance and the Tribe agreed on various terms for the loans, including charging annual interest rates between 60% and 360% and establishing a maximum loan amount of $2,500. They allege that this arrangement was created to "circumvent" the "stringent laws [that] have been enacted to prescribe how loans can be made and to prevent lenders from preying on indigent people," and to "take advantage of legal doctrines, such as tribal immunity, to avoid liability for their actions" in violating various federal and state lending laws. *Id.* 29.

## C.

Gingras and Given brought this class action in the District of Vermont, seeking, among other relief, an order barring Defendants from continuing their current lending practices. Relevant to this appeal, the Tribal Defendants moved to dismiss, arguing that they are entitled to tribal sovereign immunity.

7

The district court disagreed and denied their motion. It concluded that tribal sovereign immunity does not bar suit against the Tribal Defendants in their official capacities for prospective, injunctive relief under a theory analogous to *Ex parte Young*, 209 U.S. 123 (1908). Specifically, the district court read the Supreme Court's decision in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014), to condone that form of action to vindicate violations of state law. *See Gingras v. Rosette*, No. 15-cv-101, 2016 WL 2932163, at \*4–7 (D. Vt. May 18, 2016).

All Defendants also moved to compel arbitration pursuant to the loan agreements. The district court denied those motions. It concluded that the arbitration agreements are unconscionable and unenforceable because they insulate Defendants from claims that they have violated state and federal laws. *See id.* at \*13–18. In particular, it held that because the agreements apply tribal law exclusively and restrict all arbitral awards review solely by a tribal court, the neutral arbitral forum is illusory. All Defendants timely appealed.

II.

We first ensure that we have appellate jurisdiction of this interlocutory appeal. The district court denied two types of motions relevant to this appeal: motions to compel arbitration and motions to dismiss. Appellate jurisdiction over the motions to compel arbitration is easy enough—we exercise appellate jurisdiction under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(C).

8

As for the portion of the Tribal Defendants' motion to dismiss based on the denial of tribal sovereign immunity, we have jurisdiction over that appeal, too. Interlocutory review under the collateral order doctrine is available when an order "conclusively determine[s] the disputed question, resolve[s] an important issue completely separate from the merits of the action, and [is] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). As is the case here, denials of tribal sovereign immunity at the motion to dismiss stage conclusively determine the immunity question, and that question is one completely separate from the merits of the action. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1090 (9th Cir. 2007). Like Eleventh Amendment immunity, foreign sovereign immunity, and qualified immunity, tribal sovereign immunity is immunity from suit, not merely immunity from liability. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1050 (11th Cir. 1995) ("Tribal sovereign immunity would be rendered meaningless if a suit against a tribe asserting its immunity were allowed to proceed to trial."). Thus, because denial of that immunity is "effectively unreviewable on appeal from a final judgment," *Coopers & Lybrand*, 437 U.S. at 468, we have jurisdiction over this interlocutory appeal.

9

III.

We review *de novo* the district court's legal conclusions in denying the Tribal Defendants' motion to dismiss based on tribal sovereign immunity. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001). We review the district court's factual findings for clear error. *Id.*

Indian tribes occupy a unique space in our constitutional structure. They are "domestic dependent nations" that, on one hand, "exercise inherent sovereign authority," but, on the other hand, are "subject to plenary control by Congress." *Bay Mills*, 572 U.S. at 788 (internal quotation marks omitted). Indian tribes are "separate sovereigns pre-existing the Constitution," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), and possess all core aspects of sovereignty, at least until Congress says otherwise, *see Bay Mills*, 572 U.S. at 788.

One of the "core aspects of sovereignty" that tribes enjoy is the "common-law immunity from suit." *Id.* (quoting *Santa Clara Pueblo*, 436 U.S. at 58). That immunity extends even to suits arising from a tribe's commercial activities off Indian lands. *See Kiowa*, 523 U.S. at 760. Absent waiver or an unequivocal abrogation of tribal sovereign immunity by Congress, tribes are shielded from liability. *See Santa Clara Pueblo*, 436 U.S. at 58. Although the origins and the "wisdom" of the tribal sovereign immunity doctrine have been questioned, *see Kiowa*, 523 U.S. at 758; *Bay Mills*, 572 U.S. at 815 (Thomas, *J.*,

10

dissenting); *New York v. Shinnecock Indian Nation*, 686 F.3d 133, 148–49 (Hall, *J.*, dissenting), its existence is settled law, and apply it we must.

The Tribal Defendants here argue that because Plain Green is an "arm of the Tribe," they are entitled to immunity from all state law claims as well as Plaintiffs' federal RICO claim. We disagree and hold that under a theory analogous to *Ex parte Young*, tribal sovereign immunity does not bar state and substantive federal law claims for prospective, injunctive relief against tribal officials in their official capacities for conduct occurring off of the reservation.

## A.

We consider in the first instance whether Plain Green is an "arm of the tribe," such that tribal sovereign immunity theoretically shields its officers. Plaintiffs contend that it is not because, as we have said, "a tribe has no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014). Plaintiffs thus argue that Plain Green is a "fraudulent enterprise" that cannot be shielded by a purchased cloak of immunity. Appellee Br. at 21.

We need not definitively answer this question, however, because Plaintiffs have not sued Plain Green. Rather, they have sued several of Plain Green's officers in their *official* capacities on a theory analogous to *Ex parte Young*. It is sufficient for us, therefore, to assume that Plain Green and its officers would ordinarily be immune save for some common law exception,

11

waiver, or congressional abrogation. As the district court did, we proceed on that understanding.

B.

Tribal sovereign immunity notwithstanding, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). The Tribal Defendants here engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont. But, as the Supreme Court has said, there is a difference between demanding that tribes comply with a law and having the means available to force them to do so. *See Kiowa*, 523 U.S. at 755.

Accordingly, Plaintiffs here rely on an exception to sovereign immunity first announced in *Ex parte Young*, 209 U.S. 123. *Ex parte Young* permits plaintiffs seeking prospective, injunctive relief to sue state government officials for violations of federal law. *Id.* at 133. Given that tribal immunity arises from tribes' statuses as sovereigns, it is unremarkable that they too can be sued for prospective, injunctive relief based on violations of federal law. The question before us, however, is whether Plaintiffs can sue tribal officials, in their official capacities, for prospective, injunctive relief to bar violations of *state* law. We hold that they can.

12

The first and most obvious justification for our affirmative answer to this question is that the Supreme Court has already blessed *Ex parte Young*-by-analogy suits against tribal officials for violations of state law. In *Bay Mills*, the Supreme Court considered Michigan's lawsuit against the tribe for opening a casino outside Indian lands. 572 U.S. at 785. The Court held that the federal Indian Gaming Regulatory Act ("IGRA") did not abrogate tribal sovereign immunity, and thus Michigan's suit was barred. *Id.* The Court made clear, however, that Michigan could still "resort to other mechanisms, including legal actions against the responsible individuals" to vindicate violations of Michigan state law. *Id.* In exploring the limits of tribal sovereign immunity for conduct beyond Indian land, the Supreme Court recognized that "Michigan could bring suit against *tribal officials* or employees (rather than the Tribe itself) seeking an injunction." *Id.* at 796 (emphasis added); *see Santa Clara Pueblo*, 436 U.S. at 59. We think this plain statement that tribal officials can be sued to stop unlawful conduct by a tribe definitively resolves the issue here.[1]

The Tribal Defendants disagree and offer three arguments why the Supreme Court did not intend to say what it did. None is persuasive.

First, the Tribal Defendants argue that the Supreme Court's extended discussion of alternative remedies available to Michigan was dicta—dicta that accidentally overruled its "canonical" decision in *Pennhurst State School &*

---

[1] We join the Eleventh Circuit in so holding. *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) ("[T]ribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands.").

13

*Hospital v. Halderman*, 465 U.S. 89 (1984).  But the *Bay Mills* opinion makes clear that the availability of *Ex parte Young*-type actions for violations of state law was both necessary to the holding and perfectly consistent with *Pennhurst*.

In considering whether the IGRA abrogated tribal sovereign immunity, the Court noted that Congress intended to fix a hole in the law that prevented states from suing over gaming violations *on* Indian lands.  *Bay Mills*, 572 U.S. 790–93.  It held that the IGRA did not abrogate tribal sovereign immunity for gaming violations occurring *off* Indian lands, however, because states already had other ways to vindicate state gaming law violations there.  *Id.* at 794–95.  The petitioners in *Bay Mills* also asked the Court to revisit its decision in *Kiowa*, which extended tribal sovereign immunity to off-reservation commercial activity.  *Id.* at 791.  The Court declined, largely on *stare decisis* grounds.  It noted that "[a]dhering to *stare decisis* is particularly appropriate here given that the State, as we have shown, has many alternative remedies: It has no need to sue the Tribe to right the wrong it alleges."  *Id.* at 799 n.8.

Three distinct opinions in *Bay Mills* recognized the availability of *Ex parte Young* actions for violations of state law.  *Id.* at 796; *id.* at 809 (Sotomayor, *J.*, concurring) (rejecting the dissent's "concern that, although tribal leaders can be sued for prospective relief," (citing majority op.), Tribes' purportedly growing coffers remain unexposed to broad damages liability." (citing dissenting op.)); *id.* at 822–24 (Thomas, *J.*, dissenting).  The ability to

14

sue tribal officials for violations of state law, then, was critical to the Court's analysis and necessary to its holding.

*Bay Mills* also did not upset decades of immunity jurisprudence, as the Tribal Defendants contend. It is true that in *Pennhurst*, the Supreme Court declined to extend the *Ex parte Young* rationale to suits seeking to hold state officials accountable for violations of that state's laws. 465 U.S. at 106. The Court said that "the *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Id.* at 105 (quoting *Ex parte Young*, 209 U.S. at 160). Indeed, for a suit seeking an injunction against an official for violating his own state's laws,

> the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against the state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.

*Id.* at 106.

That case and others subsequently declining to hold state officials accountable for violations of their own state laws raise real concerns about federal courts infringing on state sovereignty. But this case does not. There is a minimal intrusion on sovereignty if federal courts are available as forums for enforcing violations of a state's law against tribal officials because tribes

15

cannot empower their officials to violate state law the way a state can interpret its own laws to permit a state official's challenged conduct. *See Mescalero Apache*, 411 U.S. at 148–49. Put differently, concerns of sovereignty oblige the federal courts not to instruct a state official how to conform her conduct to her own state law and not to instruct a tribal official how to conform his conduct to his own tribal law. There are no concomitant sovereignty concerns, however, that prevent the federal courts from instructing a tribal official how to conform that official's conduct to either state or federal law. The *Bay Mills* Court's recognition that tribal officials may be sued for violations of state law thus stands in harmony with *Pennhurst*.

The majority in *Bay Mills* acknowledged that its holding was anything but novel. In discussing how Michigan could seek an injunction against tribal officials for violating Michigan law, the Court cited *Santa Clara Pueblo* and said "[a]s this Court has stated before, analogizing to *Ex parte Young*, tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Bay Mills*, 572 U.S. at 796 (citation omitted). *Bay Mills* was not a wayward departure from, but rather a clear demarcation of, the outer limits of tribal sovereign immunity.

The Tribal Defendants offer a second reason why we should marginalize *Bay Mills*'s observation: the Supreme Court must have intended to authorize only *individual* capacity suits against tribal officials who violate state law. We see no basis to give *Bay Mills* such a cramped reading. The majority opinion

16

states that "Michigan could bring suit against tribal officials or employees (rather than the tribe itself) . . . ." *Id.* It makes little sense that the Supreme Court would take care to distinguish between tribal officials and employees, on the one hand, and the Tribe itself, on the other, if the Court did not intend that there be a difference. That passage is most logically read to mean that official capacity suits are available against tribal officials, individual capacity suits are also available to be brought, and tribal sovereign immunity bars only suits against the Tribe itself.

In addition, the Tribal Defendants' proffered reading makes little sense because the only material difference between individual and official capacity suits for prospective, injunctive relief is that a judgment against the latter is enforceable against future successive officers whereas judgments against the former are not. *See, e.g.*, *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017). From an efficiency perspective, it is impractical to require a new lawsuit and a new injunction each time a tribal official is replaced. We will not impose such a requirement here.

Finally, the Tribal Defendants urge us to construe *Bay Mills* as authorizing only *states* to sue tribal officials for prospective, injunctive relief based on violations of state law and not as authorizing *individuals* to bring those same suits. Yet "there is no warrant in [the Supreme Court's] cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff." *Va. Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 256

17

(2011).  The Supreme Court in *Bay Mills* faced a suit brought by a state.  It therefore makes sense that it would speak in terms of Michigan being able to sue, without reference to individuals.  Official capacity suits, however, have long been available to private parties.  *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–92 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938); *see also Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012) (permitting official-capacity suits of travel officials by private parties under analogy to *Ex Parte Young*).  States often rely on private parties to act as "private attorneys general" to enforce state law.  *See, e.g.*, Vt. Stat. Ann. tit. 9, § 2461 (authorizing private enforcement of the Vermont Consumer Protection Act).  We see no reason to depart from that tradition now.

Our holding balances the competing interests of tribes and states as separate sovereigns.  Absent this mechanism for a state to enforce its laws against out-of-state tribal officials, the state and its citizens would seemingly be without recourse.  Tribes and their officials would be free, in conducting affairs outside of reserved lands, to violate state laws with impunity.  Given the unique geographic and political position of Indian tribes, allowing such conduct by tribes is especially fraught.  The Constitution vests original jurisdiction in the Supreme Court for states to sue other states (a relinquishment of sovereignty originating from the Constitutional Convention, in which, regrettably, Indian tribes were not allowed to participate), *see* U.S.

18

Const. art. III, § 2, cl. 2, but it provides no parallel avenue for disputes between states and tribes. An *Ex parte Young*-type suit protects a state's important interest in enforcing its own laws and the federal government's strong interest in providing a neutral forum for the peaceful resolution of disputes between domestic sovereigns, and it fairly holds Indian tribes acting off-reservation to their obligation to comply with generally applicable state law.

C.

Apart from arguing that the *Ex parte Young*-like theory is unavailable for violations of state law, the Tribal Defendants also take issue with the application of *Ex parte Young* for alleged violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* We hold that Plaintiffs' RICO claims may proceed.

As the Tribal Defendants acknowledge, *Ex parte Young* suits are available for alleged violations of federal law. We have said, however, that the federal law under which a plaintiff seeks the injunction must provide the plaintiff with a private right of action, and the law must apply substantively to the tribe. *See Garcia*, 268 F.3d at 88. The Tribal Defendants contend that Plaintiffs' RICO claim fails on both counts. We disagree.

First, as the Tribal Defendants concede, binding Circuit precedent compels us to hold that RICO authorizes private rights of action for injunctive relief. *See Chevron Corp. v. Donzinger*, 833 F.3d 74, 137 (2d Cir. 2016) (holding that "a federal court is authorized to grant equitable relief to a private plaintiff

19

who has proven injury to its business or property by reason of a defendant's violation of [18 U.S.C.] § 1962").

Second, we hold that in these circumstances, RICO applies substantively to the Tribe. The Tribal Defendants argue that government entities like the Tribe, and "arms of the Tribe" like Plain Green, are not subject to RICO liability because they are incapable of forming the *mens rea* necessary to commit a predicate act. They argue that specific intent to defraud is an element of the predicate acts of mail and wire fraud, and thus the payday lending entity cannot be subject to RICO liability.

Some district courts (and at least one treatise) endorse a rule that government entities, and their officers sued in their official capacities, cannot ordinarily be sued under RICO. *See, e.g.*, *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 457 (S.D.N.Y. 1998); *Nu-Life Constr. Corp. v. Bd. of Educ. of the City of N.Y.*, 779 F. Supp. 248, 251 (E.D.N.Y. 1991); Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11A, at 109–13 (4th ed. 2015). At least as to suits for prospective, injunctive relief, their reasoning is not persuasive. We agree with the Third Circuit that courts exempting municipalities from RICO liability on the ground that they are incapable of forming a RICO *mens rea* have failed to furnish a defensible explanation for their conclusion, *see Genty v. Resolution Trust Corp.*, 937 F.2d 899, 909 (3d Cir. 1991), particularly given that private corporations are routinely held liable for damages under RICO.

20

It appears that the reasoning in these and other decisions has less to do with the inability of a public entity to form a criminal intent than with concern over the appropriateness of imposing the burden of punitive damages on taxpayers based on misconduct of a public official. For example, while the Ninth Circuit in *Lancaster Community Hospital v. Antelope Valley Hospital District*, 940 F.2d 397 (9th Cir. 1991), summarily asserts that "government entities are incapable of forming a malicious intent," it relies on the fact that "the taxpayers[] will pay if Lancaster's RICO claim is successful," and, in light of RICO's treble damages provisions, be "made liable for extraordinary damages as a result of the actions of a few dishonest officials." *Id.* at 404. This outcome, the court observes, would offend "public policy."[2] *Id.*

But concern for the inappropriateness of saddling the taxpayers with the financial burden of punitive damages imposed on a government entity is plainly not implicated where, as here, the relief sought is an injunction and not money damages. Accordingly, we hold that Plaintiffs' RICO claim applies substantively to the Tribal Defendants in this case.

---

[2] Furthermore, the Supreme Court's ruling in *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), on which *Lancaster* and other decisions rely, did not base its analysis on the inability of municipalities to form "criminal" or "willful" intent. Rather, in holding that Congress did not intend for punitive damages to be available under § 1983, the Court relied on the fact that "municipal immunity from punitive damages was well established at common law by 1871," such that Congress would have explicitly stated its intention to displace that common law doctrine if it intended to do so. *Id.* at 263. The Court cited state common law holdings, which were in most cases explained in terms of avoiding an undue financial burden on taxpayers, although in some cases based on the inability of municipalities to form "criminal" or "willful" intent necessary to support punitive damages. But *Newport* did not adopt that rationale. It was merely mentioned as the justification some states had given for not allowing punitive damages against municipalities. *See id.* at 260–66.

21

IV.

We turn next to the motions of all the Defendants to compel arbitration. The district court denied these motions, concluding that the dispute belongs instead in federal court because the loan agreements effectively insulate Defendants from claims that they have violated federal and state law. *See Gingras*, 2016 WL 2932163, at *18. We affirm the district court's ruling.

A.

The first question is who decides arbitrability, a question we review *de novo* to determine "whether the issue of arbitrability is for the court or for the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 565 (2d Cir. 2002).

Parties to an arbitration agreement can, of course, "agree to arbitrate 'gateway' questions of 'arbitrability.'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–85 (2002)). When an agreement "clearly and unmistakably" delegates the issue of arbitrability to the arbitrator, we will enforce it. *See id.* at 69 n.1 (internal quotation marks omitted).

Defendants argue that the agreements unambiguously require the parties' disagreements to be arbitrated. The agreements refer "any dispute" to "binding arbitration" and define "Dispute" to include "any issue concerning the validity, enforceability, or scope of . . . the Agreement to Arbitrate." J. App. 114–15. Although on its face this clause appears to give the arbitrator blanket authority over the parties' disputes, several issues give us pause. These

22

include provisions governing class actions, such as this, and the actual scope of the arbitrator's authority, given the broad authority of tribal courts to set aside the arbitrator's award. *See id.* 116.

In any event, "[i]f a party challenges the validity under [9 U.S.C.] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Center*, 561 U.S. at 71. Plaintiffs mount a convincing challenge to the arbitration clause itself. Their complaint alleges that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent." J. App. 55. That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court. *See Rent-A-Center*, 561 U.S. at 71; *see also* 9 U.S.C. § 2. The district court was correct to decide it, and we properly consider it on appellate review.[3]

## B.

We next ask whether the arbitration agreements are enforceable. The Federal Arbitration Act ("FAA") expresses a preference for enforcing arbitration clauses, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Unconscionability is one such ground. Under Vermont law, a contract provision may be unenforceable where

---

[3] Defendants would have us believe that the Supreme Court's recent decision in *Henry Schein, Inc. v. Arthur & White Sales, Inc.*, 139 S. Ct. 524 (2019), requires a different outcome. But *Schein* dealt with an exception to the threshold arbitrability question—the so-called "wholly groundless" exception—not a challenge to the validity of an arbitration clause itself. *See id.* at 529–31. As such, *Schein* has no bearing on this case.

the provision is procedurally unconscionable, substantively unconscionable, or both. *See Glassford v. BrickKicker*, 35 A.3d 1044, 1048–49 (Vt. 2011). We review *de novo* the district court's denial of the motions to compel arbitration. *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 269 (2d Cir. 2015).

This case, and the tribe-payday lending partnership it challenges, is not unique. Courts across the country have confronted transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws. *Bay Mills*, 572 U.S. at 825 (Scalia, J., dissenting). Part of this scheme involves crafting arbitration agreements like the ones here, in which borrowers are forced to disclaim the application of federal and state law in favor of tribal law (that may or may not be exceedingly favorable to the tribal lending entity). Like the Fourth and Seventh Circuits, we are not sold. We hold that the agreements here are both unenforceable and unconscionable. *See Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016); *Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014).

First, we conclude that the arbitration agreements are unenforceable because they are designed to avoid federal and state consumer protection laws. Similar to the agreement in *Hayes*, Plaintiffs' agreements here require the application of tribal law only and disclaim the application of state and federal law.[4] *See* J. App. 116–17. The arbitration mechanism in these agreements

---

[4] Defendants point to the arbitration agreements' definition of "disputes" to argue that, unlike the agreement in *Hayes*, these agreements do not explicitly disclaim federal law. That definition provides that a dispute includes claims based on a "federal or state constitution, statute, ordinance, regulation, or common law." J. App. 115. But it is far from clear what

24

purports to offer neutral dispute resolution but appears to disallow claims brought under federal and state law. And the Supreme Court has made clear that arbitration agreements that waive a party's right to pursue federal statutory remedies are prohibited. *See Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013). By applying tribal law only, arbitration for the Plain Green borrowers appears wholly to foreclose them from vindicating rights granted by federal and state law. We agree with the Fourth Circuit that "[t]he just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce." *Hayes*, 811 F.3d at 674.

Defendants' argument that tribal law perhaps incorporates, or can be supplemented with, some federal law or Montana law does not save the agreements. It is altogether unclear what that incorporation or supplementation would look like. Tribal law is generally unavailable outside of the reservation, and Plaintiffs plausibly allege that any tribal law that would be applied has been carefully tailored to protect Plain Green's interests. *See* J. App. 73 ("[The Tribe agreed to] adopt a finance code that is acceptable to all

---

import this provision provides given that two pages later the agreements specifically state that "[n]either this Agreement nor the Lender is subject to the laws of *any state* of the United States." *Id.* 117 (emphasis added). Further, and despite the lack of a similar provision in the arbitration agreement explicitly disclaiming the application of federal law, the loan agreements themselves insist that the borrower "acknowledge[s] and consent[s] to be bound to the terms of this Agreement, consent[s] to the sole subject matter and personal jurisdiction of the Chippewa Cree Tribal Court, and further agree[s] that *no other state or federal law or regulation* shall apply to this Agreement, its enforcement or interpretation." *Id.* 109 (emphasis added). At best, then, Defendants can claim that the agreements intentionally obfuscate, as opposed to explicitly disclaim, the application of federal law.

25

parties and provide for the licensing of an arm of the tribe to engage in consumer lending."). Tribal law provides no guarantee that federal and state statutory rights could be pursued, much less vindicated, in this arbitral forum.

Second, we conclude that the arbitration agreements are substantively unconscionable under Vermont law because the arbitral forum for which they provide is illusory. While the agreements provide for arbitration to be conducted by an AAA or JAMS arbitrator at a location convenient for the borrower, the mechanism of tribal court review hollows out those protections. Rather than the sharply limited federal court review of the arbitrators' decisions as constrained by the FAA, the review by tribal courts under these agreements hands those courts unfettered discretion to overturn an arbitrator's award. *See id.* 116 (any arbitral award "may be set aside by the tribal court upon judicial review"). Ultimately, the tribal court is directed to interpret its own law—alleged to be completely one-sided in favor of the tribe— which effectively insulates the tribe from any adverse award and leaves prospective litigants without a fair chance of prevailing in arbitration. *See Jackson*, 764 F.3d at 778–79 (applying Illinois law).

Adding to the unconscionability of arbitrating under these terms are the allegations of corruption in tribal government. Not only have several tribal officers pleaded guilty to federal corruption crimes, but an FBI and Interior Department investigation uncovered tribal judges who felt intimidated enough to rule for the Tribe when they otherwise may not have. *See* J. App. 279–81.

26

Requiring non-tribal plaintiffs to be subject to an illusory arbitration reviewed *in toto* by a tribal court with a strong interest in avoiding an award adverse to the lender is unconscionable.

Nor do the opt-out provisions save the agreements. Plaintiffs must opt out within 60 days of entering the agreement, which is unlikely for unsophisticated payday loan borrowers who may well be stuck in a cycle of debt and require a stream of new loans to pay off old loans. Further, opting out merely puts plaintiffs in tribal court—the same hostile forum in which they would end up after arbitration.

## C.

Finally, we must determine whether any clause ought to be severed from the agreements. Under the FAA, "an arbitration provision is severable from the remainder of the contract" unless there is a separate challenge "directed specifically to the agreement to arbitrate." *Rent-A-Center*, 561 U.S. at 71. We are well aware of our obligation to "rigorously enforce arbitration agreements according to their terms," *United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 274 (2d Cir. 2015) (internal quotation marks omitted), but Plaintiffs mount a specific, separate challenge to the arbitration clause. That that challenge overlaps with the challenges to the balance of the loan agreement does not change our analysis.

And as the district court recognized, Plaintiffs' substantive challenges to the loan agreements are based on federal and state consumer protection

27

laws. The challenge to the arbitration provisions is based on unconscionability, which we have analyzed above. We find no basis therefore to sever any particular provision of the arbitration agreement because, given the pervasive, unconscionable effects of the arbitration agreement interwoven within it, nothing meaningful would be left to enforce.

## V.

Plain Green is a payday lending entity cleverly designed to enabled Defendants to skirt federal and state consumer protection laws under the cloak of tribal sovereign immunity. That immunity is a shield, however, not a sword. It poses no barrier to plaintiffs seeking prospective equitable relief for violations of federal or state law. Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law. Attempts to disclaim application of federal and state law in an arbitral forum subject to exclusive tribal court review fare no better. The judgment of the district court is affirmed.[5]

---

[5] The district court correctly concluded that, because an *Ex parte Young*-style suit is limited to prospective injunctive relief, it does not permit the type of constructive trust remedy for unjust enrichment also sought here by Plaintiffs. *See Gingras*, 2016 WL 2932163, at \*5, \*26 n.26; *see also Edelman v. Jordan*, 415 U.S. 651, 665–66 (1974) ("equitable restitution" remedy impermissible under *Ex parte Young* because it effectively constituted a money judgment). A further question may be whether an injunction barring the Tribe from recovering the principal of its loans might cross the same line, either on the theory that the lent money belongs to the Tribe, or that such injunctive relief "transfers" from the tribe's coffers an asset (the receivable), which is effectively equivalent to money. Without expressing any view, we note this issue for the district court's consideration at some appropriate point. As Plaintiffs' demands include injunctive relief that undoubtedly falls within the protected scope of *Ex parte Young*, the question whether an injunction barring recovery of the principal of a loan is outside the scope allowed by *Ex parte Young* might be deferred to a later stage in the proceedings.