**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KIMETRA BRICE; EARL BROWNE; JILL NOVOROT,

*Plaintiffs-Appellees*,

v.

PLAIN GREEN, LLC,

*Defendant*,

and

HAYNES INVESTMENTS, LLC; L. STEPHEN HAYNES,

*Defendants-Appellants.*

No. 19-15707

D.C. No. 3:18-cv-01200-WHO

OPINION

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted September 16, 2020
San Francisco, California

Filed September 16, 2021

Before:  William A. Fletcher, Danielle J. Forrest[*], and
         Lawrence VanDyke, Circuit Judges.

Opinion by Judge Forrest;
Dissent by Judge W. Fletcher

**SUMMARY**[**]

**Arbitration**

The panel reversed the district court's order denying defendants' motion to compel arbitration in a RICO action and remanded with instructions to stay the case and compel the parties to proceed with arbitration.

Plaintiffs obtained short-term, high-interest loans from either Plain Green, LLC, or Great Plains Lending, LLC, which were owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation and the Otoe-Missouri Tribe of Indians. These "Tribal Lenders'" standard loan contracts contained an agreement to arbitrate any dispute arising under the contract. The contracts also included a delegation provision requiring an arbitrator—not a court—to decide "any issue concerning the validity, enforceability, or scope of [the loan] agreement or [arbitration agreement]." The contracts stated that they were governed by tribal law and that an arbitrator must apply tribal law. Plaintiffs filed class-

---

[*] Formerly known as Danielle J. Hunsaker.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

action complaints against the Tribal Lenders and other defendants that they alleged were the owners and investors of Think Finance, LLC, which operated a payday loan enterprise via the Tribal Lenders.

The district court denied defendants' motion to compel arbitration on the ground that the arbitration agreement as a whole in each contract was unenforceable because it prospectively waived plaintiffs' right to pursue federal statutory claims by requiring arbitrators to apply tribal law. The district court concluded that each delegation provision was unenforceable for the same reason.

Following *Rent-A-Center, West, Inc. v. Jackson*, 56 U.S. 63 (2010), and *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015), and disagreeing with other circuits, the panel concluded that, rather than asking first whether the arbitration agreement was enforceable as a whole, it must consider first the enforceability of the delegation provision specifically. The panel concluded that the parties' delegation provision was enforceable because it did not preclude plaintiffs from arguing to an arbitrator that the arbitration agreement was unenforceable under the prospective-waiver doctrine and, therefore, this general enforceability issue must be decided by an arbitrator. The panel concluded that the contracts' choice-of-law provisions were not to the contrary because they did not prevent plaintiffs' from pursuing their prospective-waiver enforcement challenge in arbitration, which was the key to determining whether the delegation provision itself was a prospective waiver.

Dissenting, Judge W. Fletcher wrote that the majority misunderstood the effect of the choice-of-law provisions in the agreements. He wrote that, under the choice-of-law

provisions, the arbitrator could apply only tribal law and a small and irrelevant subset of federal law. The prospective waivers of most federal law and all state law prevented the arbitrator from applying the law necessary to determine whether the delegation provisions and the arbitration agreements were valid. Judge W. Fletcher wrote that both the delegation provisions and the arbitration agreements therefore were invalid.

**COUNSEL**

Richard L. Scheff (argued) and David F. Herman, Armstrong Teasdale LLP, Philadelphia, Pennsylvania; Anna S. McLean and Jacqueline Simonovich, Sheppard Mullin Richter & Hampton LLP, San Francisco, California; for Defedants-Appellants.

Matthew W.H. Wessler (argued), Gupta Wessler PLLC, Washington, D.C.; Kristi C. Kelly and Andrew J. Guzzo, Kelly Guzzo PLC, Fairfax, Virginia; Leonard A. Bennett, Craig C. Marchiando, and Elizabeth W. Hanes, Consumer Litigation Associates P.C., Newport News, Virginia; Anna C. Haac, Tycko & Zavareei LLP, Washington, D.C.; for Plaintiffs-Appellees.

Patrick O. Daughtery, Van Ness Feldman LLP, Washington, D.C., for Amicus Curiae Native American Financial Services Association.

**OPINION**

FORREST, Circuit Judge:

We must decide whether a provision allowing an arbitrator, instead of a court, to decide whether an arbitration agreement that is governed by something other than federal law is unenforceable because it requires the parties to prospectively waive their federal rights. Already confused? You're not alone. Grappling with the Supreme Court's decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), we work our way through this brain twister and conclude that an agreement delegating to an arbitrator the gateway question of whether the underlying arbitration agreement is enforceable must be upheld unless *that specific delegation provision* is itself unenforceable. Because we conclude that the delegation provision in the contract at issue is not itself an invalid prospective waiver (while not resolving whether the arbitration agreement as a whole is a prospective waiver), we reverse the district court and remand with instructions to compel the parties to proceed with arbitration.  In reaching our decision, we diverge from the decisions reached by several of our sister circuits.

**I.  BACKGROUND**

Plaintiffs-appellees Kimetra Brice, Earl Browne, and Jill Novorot (Borrowers) obtained short-term, high-interest loans from either Plain Green, LLC (Plain Green) or Great Plains Lending, LLC (Great Plains Lending). The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Montana owns Plain Green; the Otoe-Missouria Tribe of Indians owns Great Plains Lending. Both lenders represented themselves as "tribal lending entities," and we refer to them collectively herein as "Tribal Lenders."

The Tribal Lenders' standard loan contracts contain an agreement to arbitrate any dispute arising under the contract.[1] And each arbitration agreement includes a delegation provision requiring an arbitrator—not a court— to decide "any issue concerning the validity, enforceability, or scope of [the loan] agreement or [arbitration agreement]." The loan contracts also make several references to "Tribal Law." For example, they state that the contracts "shall be governed by the laws of the tribe," or "Tribal Law," and that an arbitrator must "apply Tribal Law and the terms of this Agreement."

Borrowers took out payday loans from the Tribal Lenders that they now contend were illegal, and they filed class-action complaints against numerous entities, including the Tribal Lenders and Haynes Investments, LLC; Sequoia Capital Operations, LLC; and 7HBF No. 2, LTD (collectively, Investors).[2] Borrowers assert claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a)–(d), and California law. They allege that Investors are the owners and investors of Think Finance, LLC, which operated a payday loan enterprise via

---

[1] The arbitration provisions in the various contracts are not identical, but the parties agree that the relevant provisions are materially similar— as did the district court.

[2] This opinion references not only the defendants named in this case, *Brice v. Plain Green, LLC*, No. 19-15707, but also the defendants named in the companion case, *Brice v. 7HBF No. 2, Ltd.*, No. 19-17477, which we resolve today via memorandum disposition for the reasons stated in this opinion. The parties argued *Plain Green* and *7HBF* together at oral argument, and the cases involve the same borrowers and materially similar loan agreements. (The companion case *7HBF* was itself consolidated with another similar appeal, *Brice v. Sequoia Capital Operations LLC*, No. 19-17414, but the Sequoia Defendants settled after oral argument and that appeal was dismissed).

the Tribal Lenders that was "designed to evade state usury laws and make illegal high interest loans." According to Borrowers, Investors financed and actively participated in the enterprise, rendering them liable for any underlying illegal conduct.

Investors moved to compel arbitration, citing the arbitration agreements and delegation provisions in Borrowers' various loan contracts.[3] The district court denied the motions, concluding the arbitration agreement as a whole in each contract is unenforceable because it prospectively waives Borrowers' right to pursue federal statutory claims by requiring arbitrators to apply tribal law. The district court held that each delegation provision was unenforceable for the same reason. That is, the district court concluded that because tribal law governs the loan contracts and Borrowers cannot present in arbitration merits claims based on federal law, both the arbitration agreements as a whole and the "accompanying delegation clauses" are unenforceable prospective waivers. The district court did not analyze enforceability of the delegation provisions separate from the larger agreements to arbitrate. Several Investors appealed.

## II.  DISCUSSION

We review de novo the denial of a motion to compel arbitration and the validity of an arbitration clause. *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018); *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 917 (9th Cir. 2011).

---

[3] Investors made several motions; only the motion to compel arbitration is at issue here.

## A. Order of Analysis

### 1. The Parties' Arguments[4]

The parties disagree on the proper order of analysis. Investors argue the court first must decide delegation—whether there is a clear and enforceable delegation provision that requires an arbitrator to decide whether the parties' arbitration agreement is enforceable. If the *delegation provision* is enforceable, Investors argue the court must stop there and not proceed to consider whether the *arbitration agreement* is also enforceable. That task, Investors assert, is for the arbitrator. Alternatively, Investors argue that the district court erroneously held the arbitration agreements were unenforceable by misapplying the prospective-waiver doctrine.

Borrowers disagree. Like the district court, Borrowers believe the first question is enforceability of the arbitration agreement *as a whole*. If the entire arbitration agreement—delegation provision included—is unenforceable, Borrowers argue that the court need not apply the delegation provision. Accordingly, Borrowers assert that the district court properly considered and held that the parties' arbitration agreement is unenforceable because it required them to prospectively waive their statutory rights.

We agree with Investors that our focus first must be on the enforceability of the delegation provision specifically. And we conclude that, under recent decisions both from the

---

[4] The Native American Financial Services Association (NAFSA) filed an amicus brief in support of Investors in both appeals. Because NAFSA declined to address the dispositive delegation provision issue—besides a single statement supporting Investors' delegation arguments—we decline to address NAFSA's additional points.

Supreme Court and our court, the parties' antecedent delegation provision is enforceable because it does not preclude Borrowers from arguing to an arbitrator that the arbitration agreement is unenforceable under the prospective-waiver doctrine and, therefore, this general enforceability issue must be decided by an arbitrator.

## 2.  Governing Law

Under the Federal Arbitration Act (FAA), arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "establishes an equal-treatment principle." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017). "A court may invalidate an arbitration agreement based on generally applicable contract defenses like fraud or unconscionability, but not on legal rules that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (internal quotations and citation omitted).

In considering a motion to compel arbitration, we generally decide two gateway issues: (1) whether the parties agreed to arbitrate and (2) "whether the agreement covers the dispute" at issue. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). But the Supreme Court's decision in *Rent-A-Center* established that parties can agree to arbitrate even these preliminary gateway questions—provided any such agreement is "clear and unmistakable." 561 U.S. at 69 n.1. This is known as a delegation provision, which "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-*

*Center*, 561 U.S. at 70) (abrogating a judge-made exception to enforcing delegation clauses under the FAA).

Where a delegation provision exists, courts first must focus on the enforceability of that specific provision, not the enforceability of the arbitration agreement as a whole. *Rent-A-Center*, 561 U.S. at 71; *Brennan*, 796 F.3d at 1132. To do otherwise would render the delegation provision a nullity. Consider our decision in *Brennan*. There, as here, "three agreements—each nested inside the other—[wer]e relevant to our analysis": (1) the Loan Agreement, (2) the Arbitration Agreement, and (3) the Delegation Provision. *Brennan*, 796 F.3d at 1133. Thus, there were "multiple severable arbitration agreements." *Id.*; *Rent-A-Center*, 561 U.S. at 71–72 (noting "[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract" (internal quotations and citation omitted)). And one of those severable agreements delegated deciding "gateway" issues—like enforceability—to an arbitrator. Thus, in *Brennan*, "[t]he arbitration clause at issue, as in *Rent-A-Center*, [wa]s the Delegation Provision because that [wa]s the arbitration agreement [Defendants] s[ought] to enforce." 796 F.3d at 1133.

Following *Rent-A-Center* and *Brennan*, Borrowers must show that the delegation provision is *itself* unenforceable. *Rent-A-Center*, 561 U.S. at 72–74. *Rent-A-Center* contemplates that a delegation provision may be unenforceable for the same reason as the broader arbitration agreement. *See id.* at 72–74. ("[H]ad [plaintiff] challenged the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable . . . . [plaintiff] would have had to argue that the limitation upon the number of depositions causes the arbitration of his claim that the

Agreement is unenforceable to be unconscionable."). But still we must consider the enforceability argument as applied to the specific agreement at issue—here, the delegation provision. *See id.* We cannot merely mention that Borrowers challenge the delegation provision and proceed to analyze the enforceability of the entire arbitration agreement.[5]

## B. Prospective-Waiver Doctrine

With the order of analysis established, we consider the law governing Borrowers' enforceability argument. Borrowers offer one reason why both the arbitration agreement and the delegation provision are unenforceable: prospective waiver. Under the prospective-waiver doctrine—a.k.a. "effective vindication"—an arbitration agreement that waives a party's "right to pursue [federal] statutory remedies" is unenforceable. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (emphasis omitted); *see also id.* at 252 (Kagan, J., dissenting) (stating that "effective[ ]vindication . . . comes into play only when the FAA is alleged to conflict with another *federal* law").[6]

---

[5] Although Investors assert Borrowers failed to adequately challenge the delegation clause before the district court, as required by *Rent-A-Center*, that argument fails under *Smith v. Jem Grp, Inc.*, 737 F.3d 636, 640 (9th Cir. 2013), which explains that challenging the delegation provision in response to a motion to compel arbitration is enough. And that is exactly what Borrowers did.

[6] The dissent contends that the federal prospective-waiver doctrine is not limited to federal remedies, but also applies to state-law remedies. Dissent at 44. The dissent also suggests that the prospective-waiver doctrine extends to constitutional and common-law rights, not just statutory rights. *Id.* at 45. Both propositions extend the prospective-waiver doctrine beyond the Supreme Court's application. *See, e.g.*, *Italian Colors*, 570 U.S. at 236; *id.* at 252 (Kagan, J., dissenting) ("When a state rule allegedly conflicts with the FAA, we apply standard

In *Italian Colors*, the Supreme Court disparaged this doctrine as "originat[ing] as dictum" and noted that the Court has never used it to invalidate an arbitration agreement. *Id.* at 235 (majority opinion); *see also id.* at 246–47 (Kagan, J., dissenting). The Court also drew a distinction between agreements that make it more difficult *to prove* a statutory remedy and those that eliminate the right *to pursue* that remedy. *Id.* at 236 (majority opinion). Although the Court left open the possibility that agreements that make proving a statutory claim more difficult *may* be invalid based on prospective waiver, it implied that the doctrine's primary focus is on those agreements that completely eliminate the right to pursue a statutory remedy. *See id.* Indeed, in a strong dissent, Justice Kagan challenged the majority's narrow view of prospective waiver, asserting that this doctrine applies anytime "an arbitration agreement prevents the effective vindication of federal rights," *id.* at 248 (Kagan, J., dissenting), even if the agreement does not "explicitly bar[] a claim" but merely "operate[s] to do so," *id.* at 242.

## 1.   Enforceability of the Delegation Provision

In analyzing the enforceability of the delegation provision, we begin with the text of the parties' agreements. The loan contracts, including the arbitration agreements, have evolved over several years (and lawsuits). Although the precise terms of each agreement vary, the parties and the district court agreed that they are materially the same.

---

preemption principles . . . . Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law. . . . In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them.").

Each arbitration agreement—a separate section within the loan contracts—begins with an invitation to opt out. It then provides that "any Dispute" between lender and borrower "will be resolved by Arbitration." The arbitration agreement instructs: "Dispute is to be given its broadest possible meaning, and includes … all *federal, state, or Tribal Law* claims or demands . . . based on *any legal or equitable theory*…." The delegation provision at the heart of this case is part of the broad definition of "Dispute," and states: "A Dispute includes any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate."[7] The key provisions we ultimately find determinative state in full:

**AGREEMENT TO ARBITRATE:** You and we (defined below) agree that any Dispute (defined below) will be resolved by Arbitration.

**WHAT ARBITRATION IS:** "Arbitration" is having an independent third-party resolve a Dispute. A "Dispute" is any claim or controversy of any kind between you and us or otherwise involving this Agreement or the Loan. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all federal, state or Tribal Law claims or demands (whether past, present, or future), based on any legal or equitable theory and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief). A Dispute includes any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate.

The loan contracts also contain multiple choice-of-law provisions directing that the parties' relationship "shall be governed by the laws of the tribe," or "Tribal Law." The contracts specify that "neither this agreement nor [the lender] is subject to the laws of any *state* of the United States." However, certain federal laws are expressly referenced as governing the contract and "[*the lender*] may choose to voluntarily use certain federal laws as guidelines for the provision of services" even though "such voluntary

---

[7] Borrowers do not dispute that the delegation provision indicates a "clear and unmistakable" intent to arbitrate gateway issues. *See Rent-A-Center*, 561 U.S. at 68–69 (noting that similar terms demonstrated a clear and unmistakable intent to delegate arbitrability issues).

use does not represent acquiescence of [*the tribe*] to any federal law unless found expressly applicable." On the plain language of these terms, federal law is not foreclosed in the same way state law is foreclosed. The arbitration agreement also specifies that tribal law is not the only source of authority by directing the arbitrator to "apply Tribal Law *and the terms of this Agreement*, including this Agreement to Arbitrate."

The arbitrator is limited to "award[ing] all remedies available under Tribal Law, whether at law or in equity," and an "arbitration award . . . must be consistent with this Agreement and Tribal Law." The loan contract clarifies that the selection of tribal law applies even if the arbitration is held on non-tribal land:

> [A]rbitration . . . under this Agreement may be conducted either on Tribal land or within thirty . . . miles of [borrower's] current residence, at [borrower's] choice, provided that this accommodation . . . shall not be construed in any way . . . to allow for the application of any law other than Tribal Law.

In determining whether the *delegation provision* is unenforceable, we must decide whether this particular provision precludes Borrowers from presenting and having the arbitrator decide whether the arbitration agreement is unenforceable as a prospective waiver under the federal law. That is, does the delegation provision prohibit the arbitrator from considering disputes "concerning the . . . enforceability" of the arbitration agreement that are based on federal law? Under governing precedent, we conclude that the delegation provision is enforceable because it does not eliminate Borrowers' right *to pursue* in arbitration their

prospective-waiver challenge to the arbitration agreement as a whole, even though that challenge arises under federal law. *See Italian Colors*, 570 U.S. at 235. The plain language of the delegation provision does not foreclose the arbitrator from considering enforceability disputes based on federal law. The description of what an arbitrator can decide expressly includes enforceability disputes arising under "*federal, state, or Tribal Law . . .* based on *any legal or equitable theory*." This necessarily means that Borrowers' rights to pursue their federal prospective-waiver argument remains intact at this stage of the proceedings and the delegation provision is not facially a prospective waiver.

The choice-of-law provisions do not undermine this conclusion. As Borrowers themselves point out, the arbitration agreement—not the delegation provision—limits the arbitrator to "awarding remedies available under Tribal Law." Unlike the definition of "Dispute," the additional, antecedent delegation provision does not expressly incorporate this remedial limitation. Additionally, the plain meaning of the remedial limitation does not *necessarily* conflict with the delegation provision. Deciding whether an arbitration agreement is enforceable does not result in an "award"—unlike, for example, resolving a claim brought under RICO for which plaintiffs are seeking damages or some other remedy. That the scope of remedies awardable on a merits claim is limited to those remedies available under tribal law does not undermine the conclusion that Borrowers can present a contract enforceability argument based on federal law to the arbitrator where such is expressly provided for in the delegation provision.

Nor do the choice-of-law provisions limit the arbitrator to considering only tribal law in resolving enforceability disputes. To begin, the instruction in the arbitration

agreement that "[t]he arbitrator shall apply Tribal Law *and* the terms of this Agreement" does not limit the arbitrator to considering only tribal law. If that sentence ended before "and," perhaps it would foreclose the arbitrator from considering prospective waiver or other non-tribal-law grounds for unenforceability (assuming tribal law does not recognize prospective waiver and the Investors do not agree to application of this doctrine). But because the arbitrator also is instructed to apply "the terms of this Agreement" in deciding enforceability issues, and the parties' arbitration agreement contemplates disputes arising under "federal, state, or Tribal Law . . . based on any legal or equitable theory," the arbitrator is not clearly foreclosed from considering Borrowers' prospective-waiver argument. *Cf. Dillon v. BMO Harris, N.A.*, 856 F.3d 330, 333 (4th Cir. 2017) (contract expressly provided "no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation"). That is, again, the term of the arbitration agreement relevant here—the delegation provision—does not itself prevent Borrowers from raising an enforceability challenge based on federal law.

While the choice-of-law provisions dictating that tribal law governs the parties' relationship could be viewed as conflicting with the delegation provision's plain meaning, they do not defeat its plainly stated mandate that the arbitrator decide enforceability issues from whatever source they arise. We do not dispute that the loan contract's selection of tribal law as the governing authority may mean the arbitrator will ultimately decide she cannot consider an enforceability challenge to the arbitration agreement as a whole based on prospective waiver if tribal law does not recognize this doctrine. But that possibility does not prevent Borrowers from *pursuing* their prospective-waiver enforcement challenge in arbitration, which is the key in

determining whether *the delegation provision* is itself a prospective waiver. Especially where the definition of "Dispute," the operative term in the delegation provision— which, again, is an additional, antecedent agreement— includes "federal . . . claims based on *any* legal or equitable theory" and "includes *any* issue concerning the validity, enforceability, or scope of [the arbitration agreement]." At this preliminary stage in the proceedings, the risk that the arbitrator will decide the prospective-waiver doctrine has no application to the parties' contract because it arises under federal law only "diminishes," but does not "foreclose[]," Borrowers' "opportunity to gain relief for a statutory violation." *Italian Colors*, 570 U.S. at 244 (Kagan, J., dissenting). This is not enough.[8]

---

[8] Indeed, where there "is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies." *Dillon*, 856 F.3d at 334 (citing *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540–41 (1995)); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009) (noting the Court hesitates "to invalidate arbitration agreements on the basis of speculation"); *cf. Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (internal quotations and citation omitted)). In other words, "the prospective waiver issue would not become ripe for final determination until the federal court was asked to enforce the arbitrator's decision." *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 340 (4th Cir. 2020). Thus, even those circuits that the dissent contends we should line up behind might hesitate at this stage of the proceedings to decide that a delegation clause—properly considered as a separate and independent agreement—was invalid under the prospective-waiver doctrine where there is uncertainty as to whether the plaintiffs could pursue their federal remedies in arbitration. *See also Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 371–73 (4th Cir. 2012).

The dissent disagrees, asserting that the choice-of-law provisions "categorically foreclose[]" Borrowers from obtaining relief on their federal claims." Dissent at 47. But the dissent cites to no language in the arbitration agreement or delegation provision disavowing application of federal law generally, much less any language that would prevent the arbitrator from considering a "legal or equitable theory" regarding contract enforceability that arises under "federal law." To be clear, the choice-of-law provisions do not state that only tribal law applies, or that the arbitrator cannot apply any law other than tribal law. While the contracts do clearly foreclose reliance on state law, the same is not true of federal law. We do not dispute (nor could we) that the contracts give tribal law preeminence, but contrary to the dissent's assertion, there is nothing in the delegation provision or otherwise that *forecloses* the arbitrator from considering and applying the prospective-waiver doctrine in resolving the gateway question of whether the parties' arbitration agreement is enforceable. The dissent apparently infers that because the contract states tribal law shall govern, all other law shall not. Indeed, that it shall not apply in any way whatsoever, whether as the source of a substantive right or a procedural, enforceability doctrine. Not even as the source of the enforceability doctrine designed to provide Borrowers relief from the very contractual discrepancy that the dissent discerns. This goes beyond an inferential leap; it interprets the contract to say something that it does not say.

The closest the contracts come to the interpretation reached by the dissent is language in the loan agreement stating: "This Agreement and the Agreement to Arbitrate are governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America." This provision less clearly delineates the arbitrator's power than other, less limited

provisions in the arbitration agreement. Yet, from this language the dissent reasons that the arbitrator is prohibited from considering a prospective-waiver challenge to enforceability of the arbitration agreement. How? The dissent cites the principle of "*expressio unius est exclusio alterius*," reasoning that because one choice-of-law provision mentions the applicability of a limited segment of federal law, the arbitrator cannot consider any other federal law or federal-law-derived enforceability arguments, such as the prospective-waiver doctrine. But what is puzzling is the dissent reaches this conclusion even though the arbitration agreement authorizes an arbitrator to decide disputes "based on *any* legal or equitable theory . . . . includ[ing] any issue concerning the validity, enforceability, or scope of . . . [the arbitration agreement]." That stretches the Latin beyond reason. Indeed, if we were to apply the principle of "the expression of one thing implies the exclusion of others" to that same choice-of-law section, we would wonder what the specific, unequivocal prohibition against applying *state* law implies about the application of *federal* law.

To be sure, to assume that the Tribal Lenders and Investors sought to avoid the application of federal law is not absurd given the nature of these loans and the history of these entities. But propriety and past behavior are not our focus when analyzing the delegation clause under the prospective-waiver doctrine. Our focus is on whether the contractual language forecloses, i.e., *renders impossible*, Borrowers' pursuit of their federal remedies—here by making it impossible for them to convince an arbitrator that the arbitration agreement as a whole is invalid because it required them to prospectively waive their federal rights. The delegation clause and arbitration agreement here, unlike some of the other agreements at issue in the cases discussed below, contain no such language. Thus, contrary to the

district court's analysis, we first consider the validity of the delegation provision in its proper context as an additional, antecedent agreement, and conclude that it is not itself an unlawful prospective waiver because it does not prevent Borrowers from arguing that the arbitration agreement is unenforceable under the federal prospective-waiver doctrine. We cannot say what the arbitrator will make of that argument, but that uncertainty is not grounds for invalidating the parties' agreement to arbitrate. *See Mitsubishi Motors Corp.*, 473 U.S. at 637, n.19 (declining to invalidate arbitration agreement based on speculation of how arbitrator might apply a choice-of-law provision).

### 2. Contrary Out-Of-Circuit Authority

As noted above, we reach a different conclusion than some of our sister circuits. We now address the contrary out-of-circuit decisions and why we disagree with them. *See Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) ("As a general rule, we decline to create a circuit split unless there is a compelling reason to do so." (citation and quotations omitted)).

### a. The Decisions

### i. Fourth Circuit

In *Hayes v. Delbert Services Corp.*, the Fourth Circuit refused to compel arbitration in a dispute between a tribal lender and borrowers. 811 F.3d 666, 676 (4th Cir. 2016). There, like here, the borrowers alleged the tribal lenders' high-interest rates violated various federal laws, and, in response, the servicing agent sought to enforce the arbitration agreement and compel arbitration. The agreement stated, in pertinent part, that the arbitrator will not apply "any law other than the law of the Cheyenne River Sioux Tribe of

Indians to this Agreement." *Id.* at 675. Although the agreement also included a provision delegating arbitrability questions to an arbitrator, *id.* at 671 n.1, the court declined to focus on that provision, concluding that "Hayes . . . challenged the validity of that delegation with sufficient force and specificity to occasion our review." *Id.* And in the court's review, it focused on the arbitration agreement *as a whole*, invalidating the entire agreement under the prospective-waiver doctrine—including, implicitly, the delegation provision. *Id.* at 675. Specifically, the court held the arbitration agreement invalid and unenforceable because it "flatly and categorically . . . . waive[d] all of a potential claimant's federal rights." *Id.* Indeed, the court condemned the contract in no uncertain terms: calling it a "brazen" attempt to "game the entire system." *Id.* at 676.

A year later, in *Dillon*, the Fourth Circuit again invalidated a tribal loan agreement under the prospective-waiver doctrine, concluding that the arbitration agreement was "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*." 856 F.3d at 336. Comparing the *Dillon* agreement to the *Hayes* agreement, the court concluded the *Dillon* agreement was indistinguishable despite its different terms: "[t]he arbitration agreement in this case implicitly accomplishes what the [*Hayes*] Agreement explicitly stated, namely, that the arbitrator shall not allow for the application of any law other than tribal law." *Id.* at 335. Although the *Dillon* agreement included a delegation clause, the *Dillon* court did not discuss it.[9]

---

[9] At oral argument before this court, counsel for Investors stated that one of the many *Dillion* loan agreements was the same as the agreements presently before us.

Rounding out the Fourth Circuit's trifecta is *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 339 (4th Cir. 2020), another tribal lending case. At first glance, *Gibbs* would appear to be more of the same—but it is worth discussing for two reasons: (1) the underlying loan agreements are identical to those in the present case and (2) the Fourth Circuit addressed the delegation clause more directly than it did in *Hayes* or *Dillon*. *See id.* The *Gibbs* court noted first that it "must decide whether the delegation provision is unenforceable 'upon such grounds as exist at law or in equity.'" *Id.* at 338 (quoting *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 455 (4th Cir. 2017)). After noting that "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration provisions," the court concluded that "because the choice-of-law provisions contained in both the Plain Green and Great Plains arbitration agreements operate as prospective waivers, the delegation clauses (and therefore the arbitration agreements) are unenforceable." *Id.* at 338–41 (alteration in original).

Although the Fourth Circuit framed the issue as one focused on the delegation clause specifically, its analytical spotlight shone on the arbitration agreement generally. *See id.* Like in *Hayes* and *Dillon*, the *Gibbs* court focused on terms in the arbitration agreement that the delegation clause did not reference or incorporate. And even though "[u]nlike in *Hayes* and *Dillon*, the Plain Green and Great Plains arbitration agreements do not explicitly preclude the application of federal law . . . . [the court concluded] the practical effect is the same because they do provide that tribal law preempts the application of any contrary law— including contrary federal law." *Id.* at 341–42 (emphasis omitted). In so concluding, the court discussed various terms

in the arbitration agreement at length but did not mention the delegation clause again until its conclusion. Even then, the court did not discuss it in any detail but merely concluded, like the *Hayes* court, that prospective waiver rendered the *entire* arbitration agreement—including the specific delegation clause—unenforceable. *Id.* at 343–45.

### ii. Third Circuit

Just a week before *Gibbs*, the Third Circuit addressed its own tribal loan dispute in *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020). Focusing first on the delegation clause, the *Williams* court concluded that the borrowers explicitly referenced the delegation clause in their opposition to the motion to compel, which raised a specific challenge enabling the court to "proceed to examine [p]laintiffs' enforceability arguments." *Id.* at 238. "Plaintiffs contend[ed] that the arbitration agreement, including the delegation clause, [was] unenforceable under the prospective waiver doctrine." *Id.* Considering the terms of agreement—many of which are similar to those here—the Third Circuit concluded that "the plain language of the arbitration agreement and the loan agreement shows that only tribal-law claims may be brought in arbitration." *Id.* at 239. Although the contract did not expressly forbid application of federal law or the assertion of federal claims, the court determined that "[b]ecause the arbitration agreement mandates that only tribal law applies in arbitration, federal law does not." *Id.* at 240. "By limiting the claims available to borrowers to tribal-law claims," the court continued, "the arbitration agreement . . . requires a borrower to prospectively waive claims based on any other law." *Id.* at 241. In other words, "because the arbitration agreement [was] clear that only tribal-law claims are

available . . . that pronouncement is enough to show that federal-law claims are unavailable." *Id.*

Nearing its conclusion, the *Williams* court paused to provide—in a footnote—a bit more depth on why it concentrated on the entire arbitration agreement rather than the delegation clause:

> Even if we analyzed the delegation clause entirely separately, we would conclude it is unenforceable. As one district court in this Circuit explained, while the arbitration agreement delegates arbitrability determinations to the arbitrator, it also provides that the arbitrator can only apply tribal law, so "the arbitrator would be expressly forbidden from relying on any federal or state law, which means that the arbitrator could not ask whether the arbitration clause—and its complete exclusion of federal law—would violate the federal public policy against arbitration clauses that operate as a prospective waiver . . . . Quite possibly, the arbitrator would uphold the arbitration clause, because there would be no principle of federal law standing in the way. Enforcing the delegation clause would effectively allow [the lender] to subvert federal public policy and deny [the borrower] the effective vindication of her federal statutory rights before the arbitration of her claims even began."

*Id.* at 243 n.14 (alterations in original) (quoting *Ryan v. Delbert Servs. Corp.*, No. 5:15-cv-05044, 2016 WL

4702352, at \*5 (E.D. Pa. Sept. 8, 2016)). Thus, the *Williams* court held the entire arbitration agreement was unenforceable under the doctrine of prospective waiver.[10] *Id.*

### iii. Second Circuit

In *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 117 (2d Cir. 2019), the Second Circuit also considered an arbitration agreement in loan contracts involving tribal lenders. Indeed, that case involved the same tribal lending entity—Plain Green, LLC—as the present case and at least one of the former parties in this case—Sequoia. *Id.* at 119. Like the Third Circuit in *Williams*, the Second Circuit first discussed the delegation clause. *Id.* at 125–26. Although the court noted that the delegation clause appears to give an arbitrator "blanket authority" over disputes involving the validity, enforceability, and scope of the arbitration agreement, it nevertheless continued past that provision and analyzed the enforceability of the entire arbitration agreement:

> "[I]f a party challenges the validity under [9 U.S.C.] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4 [of the FAA]." Plaintiffs mount a convincing challenge to the arbitration clause itself. Their complaint alleges that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent." That specific attack on the delegation provision is sufficient to make the issue of arbitrability

---

[10] Investors stated at oral argument that one of the agreements at issue in *Williams* was also the same as those presently before us.

one for a federal court. . . . [W]e properly consider it on appellate review.

*Id.* at 126 (internal citations omitted).

Considering the arbitration agreements in their entirety, the court concluded they were "unenforceable because they are designed to avoid federal and state consumer protection laws." *Id.* at 127. The court further reasoned: "By applying tribal law only, arbitration for the Plain Green borrowers appears wholly to foreclose them from vindicating rights granted by federal and state law." *Id.* In other words, the *Gingras* court applied the prospective-waiver doctrine to invalidate the entire arbitration agreement because "tribal law provides no guarantee that federal and state statutory rights could be pursued, much less vindicated."[11] *Id.*

### b. Reason for Disagreement

In our view, our sister circuits have conflated the analysis under *Rent-A-Center*. The out-of-circuit decisions considered prospective waiver in the context of the arbitration agreement as a whole—not as applied to the delegation provision. Put simply, those decisions go like this: the arbitration agreement includes a delegation provision, but the entire arbitration agreement is unenforceable, thus, the delegation provision is too. *See, e.g.*, *Williams*, 965 F.3d at 243 (holding "[t]he prospective waiver of statutory rights renders the entire arbitration agreement (delegation clause included) unenforceable"). This approach conflicts with *Rent-A-Center* and our decision in *Brennan. See Rent-A-Center*, 561 U.S. at 70, 74; *Brennan*,

---

[11] Again, Investors stated at oral argument that the *Gingras* agreements are identical to those here.

796 F.3d at 1132. Our sister circuits considered the wrong thing by "confus[ing] the question of who decides arbitrability with the separate question of who prevails on arbitrability." *Henry Schein, Inc.*, 139 S. Ct. at 531. The proper question is not whether the entire arbitration agreement constitutes prospective waiver, but whether the antecedent agreement delegating resolution of that question to the arbitrator constitutes prospective waiver.

Although some of the out-of-circuit decisions properly tee up the question, none of them follow through. Take *Gibbs*: The Fourth Circuit began by noting that it must decide whether the delegation clause itself was unenforceable. 967 F.3d at 339. But in its analysis, it never mentions the text of the delegation clause, which is the same as that at issue in the present case. *See id.* at 340–45. The *Gibbs* court does not explain how the delegation clause— "the precise agreement to arbitrate at issue"—prospectively waived plaintiffs' statutory rights. *Rent-A-Center*, 561 U.S. at 71. Instead, it concluded the choice-of-law and forum-selection provisions prospectively waived plaintiffs' statutory rights and that those terms rendered the entire arbitration agreement—severable delegation clause included—unenforceable. *Id.* Left unexplained is why an arbitrator—charged with "applying tribal law and the terms of the Agreement"—would rely on choice-of-law and forum-selection terms to ignore a prospective-waiver challenge to the enforceability of the entire arbitration agreement where there is a delegation clause that expressly allows a plaintiff to assert all "federal claims . . . based on any legal or equitable theory," including "*any issue* concerning [] validity [or] enforceability."

Trying to reconcile our sister circuits' decisions with *Rent-A-Center*, we posit that they view a party's "specific

challenge" to a delegation clause as a purely formal, procedural requirement. Perhaps in their view a party complies with *Rent-A-Center* if the party claims the delegation clause is unenforceable even if the arguments made go only to enforceability of the arbitration agreement as a whole. That is, so long as a party states the delegation clause is invalid, that is enough. We disagree. We read *Rent-A-Center* as requiring a substantive argument that the delegation provision *in and of itself* is unenforceable. A party challenging a delegation clause via contract-wide arguments must show how the claimed deficiencies *as applied to the delegation clause* render that specific agreement invalid. *Id.* at 74. Such arguments are "of course . . . much more difficult . . . to sustain" than arguments applying the asserted contractual deficiency in the context of the claim potentially being arbitrated. *Id.* But our focus is not on what would happen in arbitration but on who should decide what happens in arbitration and whether having an arbitrator decide enforceability prevents a plaintiff from arguing that it should not be compelled to arbitrate. While it may be confusing, this is a necessary distinction.

Perhaps our sister circuits believe, as Borrowers certainly do, that whether these agreements prospectively waive Borrowers' federal statutory rights is a foregone conclusion. We do not dispute that Borrowers have a reasonable argument that the arbitration agreement as written precludes them from asserting their RICO claims or other federal claims in arbitration. *See Italian Colors*, 570 U.S. at 235 (explaining that a prospective-waiver argument is strongest when a contract eliminates the right to pursue a statutory remedy). And if that is true, the arbitration agreement is likely unenforceable as a prospective waiver. *See id.* But, when there is a clear delegation provision, that question is not for us—or anyone else wearing a black

robe—to decide. Instead, it is for the arbitrator to decide so long as the delegation provision itself does not eliminate parties' rights to purse their federal remedies. Refusing to allow an arbitrator to decide the question, even if we think the answer is obvious, runs counter to the Supreme Court's clear instructions that "a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Henry Schein, Inc.*, 139 S. Ct. at 529–30 ("A court has no business weighing the merits of the grievance because the agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." (internal quotations and citation omitted)). No matter the court's view of the merits, no matter the inefficiency, no matter the time and money potentially saved. *See id.* Instead, we "must respect the parties' decision as embodied in the contract." *Id.* at 531.

### 3. Practical Effects

Finally, we note the practical effects of compelling arbitration. If Borrowers succeed in convincing an arbitrator that the arbitration agreement is unenforceable as a prospective waiver, Borrowers may return to federal court and assert their claims. If Borrowers' prospective-waiver argument fails to convince the arbitrator because she concludes the agreement allows Borrowers to assert their federal claims, the obvious result is that Borrowers can bring their federal claims in arbitration and they did not prospectively waive anything. And if the arbitrator concludes she cannot consider a prospective-waiver challenge to enforceability of the arbitration agreement, Borrowers can return to court and argue the arbitrator exceeded her powers. *See PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004) (describing the process for back-end review under the FAA). No matter

what, Borrowers will have the opportunity to assert their federal claims or show that the arbitration agreements "foreclosed" their ability to do so. Flowing logically from these alternatives—one of which must occur if this dispute continues—is our conclusion in this case: Borrowers cannot show the delegation clause *itself* prospectively waives their opportunity to pursue their federal rights. How could it where the worst-case scenario is that an arbitrator *may* prevent Borrowers from presenting their federal claims and, if so, Borrowers *will* have the opportunity to object to a court that the arbitrator exceeded her authority and ask that any award be vacated.[12] In such circumstances, compelling arbitration is consistent with congressional policy—strictly enforced by the Supreme Court—of placing arbitration agreements on equal footing with other contracts and "reversing centuries of judicial hostility to arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 (1974) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess. 1, 2 (1924)).

## III.  CONCLUSION

Though courts may deem arbitration agreements distasteful or unjust in certain contexts, particularly where

---

[12] We acknowledge that a federal court's back-end review of arbitration awards is "both limited and highly deferential and an arbitration award may be vacated only if it is completely irrational or constitutes manifest disregard of the law." *PowerAgent Inc.*, 358 F.3d at 1193 (internal quotations and citation omitted). At least one circuit, however, seems to recognize that whether an arbitrator erred in rejecting a prospective-waiver challenge is reviewable. *See Gibbs*, 967 F.3d at 340 ("The prospective waiver issue would not become ripe for final determination until the federal court was asked to enforce the arbitrator's decision."); *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (2003).

they limit consumer rights and remedies, both Congress and the Supreme Court have instructed us to respect agreements to arbitrate just as any other contractual agreement. Here, there can be no dispute that the parties agreed to arbitrate both their substantive disputes as well as any gateway questions regarding enforceability of their arbitration agreement. The latter agreement—the delegation provision—does not prevent Borrowers from challenging enforceability based on prospective waiver because that doctrine arises from federal law. Therefore, we conclude that the delegation provision is not itself invalid as a prospective waiver and that it is for an arbitrator, not the court, to decide whether the parties' arbitration agreement is enforceable.

**REVERSED and REMANDED with instructions to stay the case and compel arbitration.**

---

W. FLETCHER, Circuit Judge, dissenting:

Plaintiffs sued a number of defendants, alleging that they conspired to charge interest rates of over 400% per annum on internet "payday" loans, using a "rent-a-tribe" scheme in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and of California usury and unjust enrichment laws. The payday loan agreements include agreements to arbitrate disputes related to the loan agreements. The arbitration agreements contain provisions that delegate to the arbitrator the task of determining the validity of the arbitration agreement. Two of the defendants moved to compel arbitration. The district court denied the motion to compel, and the two defendants appealed.

There are two questions in this appeal. The first is whether the delegation provisions in the arbitration

agreements are valid.  The second is whether the arbitration agreements as a whole are valid.  Until now, every federal court but one has refused to compel arbitration in cases involving tribal internet payday loans.  In that one case, the borrowers had failed to challenge the delegation provision.  Splitting with all of our sister circuits that have addressed the question, my colleagues hold the delegation provisions valid.  My colleagues do not reach the second question.

My colleagues misunderstand the effect of the choice-of-law provisions in the agreements.  Under the choice-of-law provisions, the arbitrator may apply only tribal law and a small and irrelevant subset of federal law.  The prospective waivers of most federal law and all state law prevent the arbitrator from applying the law necessary to determine whether the delegation provisions and the arbitration agreements are valid.  This renders both the delegation provisions and the arbitration agreements invalid.

I strongly but respectfully dissent.

## I.  Background

### A.  "Payday" Loans

"Payday" loans are "high-cost, small-dollar loans" made to low-income, low-credit borrowers with a "repayment system that involves the lender withdrawing funds directly from the borrower's bank account."  *Consumer Financial Regulation—CFPB's Final Payday Lending Rule Deems It an "Unfair" and "Abusive" Practice to Make Payday Loans Without Determining Borrower Ability to Repay*, 131 Harv. L. Rev. 1852, 1852 (2018).  The loans are marketed to financially vulnerable consumers who typically cannot make timely payments on their loans.  *See CFPB Finalizes Rules to Stop Payday Debt Traps*, CFPB (Oct. 5, 2017),

https://www.consumerfinance.gov/about-us/newsroom/cfpb
-finalizes-rule-stop-payday-debt-traps/.    Borrowers often
must choose among defaulting, re-borrowing, or skipping
other financial obligations such as payments for housing,
food, or medical care.  *Id.*  Borrowers can be caught in a
"long-term debt trap," either "rolling over" their loan
payments or refinancing their loans, incurring substantial
new charges that often exceed the amount they receive in
credit.  *Id.* (noting that 80% of loans are reborrowed within
a month, typically around the time the loan is due or shortly
thereafter).

Most states regulate payday loans.  These states protect
their citizens from usurious payday lending either by
prohibiting payday loans entirely or by capping annual
interest rates and requiring installment repayment schedules.
*See Payday, Vehicle Title, and Certain High-Cost
Installment Loans*, 82 Fed. Reg. 54,472, 54,476 (Nov. 17,
2017).  In California, a lender generally may not charge more
than 10% interest per annum on a loan.  Cal. Const. Art. XV
§ 1.  An interest rate above 10% is usurious and renders a
loan agreement void.  Cal. Civ. Code § 1916-2; *Heald v.
Friis-Hansen*, 52 Cal. 2d 834, 838–39 (1959).

Internet payday lenders have a history of noncompliance
with state usury laws.  They have used a variety of tactics to
evade state laws, including "renting bank charters."
Consumer Fed'n of Am. and the U.S. Pub. Int. Rsch. Grp.,
*Rent-A-Bank Payday Lending: How Banks Help Payday
Lenders Evade State Consumer Protections* (Nov. 2001),
https://consumerfed.org/pdfs/paydayreport.pdf.   Beginning
in 2005, federal regulators began cracking down on payday
lenders' "rent-a-bank" arrangements.    Creola Johnson,
*America's First Consumer Financial Watchdog Is on a
Leash: Can the CFPB Use Its Authority to Declare Payday-*

*Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.116 (2012).

In response, several internet payday lenders replaced banks with Indian tribes in so-called "rent-a-tribe" arrangements where tribal shell corporations, acting as fronts for non-Indian payday lenders, charge borrowers exorbitant interest rates. *Id.* at 399. The loan agreements for tribal internet payday lenders require that any dispute arising out of the agreement be decided by arbitration, and that the arbitrator decide the validity of the arbitration agreement.

Until this appeal, every federal court but one dealing with tribal internet payday loans has refused to compel arbitration. *See Gingras v. Think Finance, Inc.*, 922 F.3d 112 (2d Cir. 2019) (*Hall*, Leval, Chin, JJ. (unanimous)); *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229 (3d Cir. 2020) (*Schwartz*, Scirica, Cowen, JJ. (unanimous)); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020) (*Agee*, Gregory, Motz, JJ. (unanimous)); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) (unanimous); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017) (*Keenan*, Duncan, Thacker, JJ. (unanimous)); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) (*Wilkinson*, Keenan, Harris, JJ., (unanimous)); *Smith v. W. Sky Fin.*, 168 F. Supp. 3d 778 (E.D. Pa. 2016); *Hengle v. Asner*, 433 F. Supp. 3d 825 (E.D. Va. 2020); *Titus v. ZestFinance, Inc.*, 2018 WL 5084844, at *5 (W.D. Wash. Oct. 18, 2018), *vacated on other grounds by Titus v. BlueChip Fin.*, 786 F. App'x 694 (9th Cir. 2019); *Ryan v. Delbert Servs. Corp.*, 2016 WL 4702352, at *4 (E.D. Pa. Sept. 8, 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *6 (D. Nev. Mar. 8, 2018); *cf. Swiger v. Rosette*, 989 F.3d 501 (6th Cir. 2021) (enforcing delegation provision because plaintiff failed to challenge it).

## B.  This Litigation

Named plaintiffs-appellees are Kimetra Brice, Earl Browne, and Jill Novorot ("Plaintiffs").  They are all residents of California.  Using the internet in California, all three Plaintiffs obtained short-term, high-interest internet payday loans from Great Plains Lending ("Great Plains"), a corporation owned by the Otoe-Missouria Tribe, whose reservation is in Oklahoma.  Plaintiff Browne also obtained such loans from Plain Green, a corporation owned by the Chippewa Cree Tribe, whose reservation is in Montana.  The allegations in Plaintiffs' complaint are assumed to be true.

In brief, Plaintiffs allege as follows.  Defendant Kenneth Rees owns a company called Think Finance.  Think Finance entered into agreements with the Otoe-Missouria Tribe and the Chippewa Cree Tribe.  Pursuant to the agreements, the tribes created corporations under tribal law, Great Plains and Plain Green, respectively.  Think Finance provided each corporation with funds to originate the high-interest internet payday loans.  Think Finance controlled the terms, origination, and servicing of the loans.

Defendant GPL Servicing, largely owned by defendant Victory Park Capital Advisors, raised capital for Think Finance from third-party investors.  Think Finance guaranteed investors a fixed-rate return of 18–20%.  Defendant-appellant Haynes Investments is a private equity firm owned and controlled by individual defendant-appellant L. Stephen Haynes (collectively, the "Haynes defendants").  Haynes Investments provided capital to Think Finance for use by Plain Green.  L. Stephen Haynes played a key role in finding a bank willing to process loan payments to Great Plains and Plain Green through an electronic system that allowed for direct access to the borrowers' bank accounts.

With exceptions not relevant here, California's usury law provides that interest rates may not exceed 10% per annum. Cal. Const. Art. 15, § 1; Cal. Civ. Code §§ 1916-2, 1916-3. The interest rate on loans made to Plaintiffs by Great Plains and Plain Green far exceeded 10%. Interest rates on two of plaintiff Novorot's loans from Great Plains were 441.38% and 448.67% per annum.

Plaintiffs filed a putative class action in federal district court against a number of defendants, including those named in the brief narrative above. Their complaint alleged four counts of violating RICO, 18 U.S.C. § 1962, one count of violating California's usury statute, Cal. Civ. Code § 1916–2, and one count of unjust enrichment under California law.

The two Haynes defendants moved to compel arbitration. No other defendant moved to compel arbitration. The district court denied the motion. The Haynes defendants appeal.

## II. Discussion

### A. *Rent-A-Center*

Parties to an arbitration agreement may delegate to the arbitrator threshold determinations of the validity and scope of the arbitration agreement. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010) (validity); *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) (scope). If there is a delegation provision and the plaintiff seeks to avoid arbitration on the ground that the arbitration agreement is invalid, a plaintiff must specifically challenge the validity of the delegation provision, separate from and prior to any challenge to the arbitration agreement as a whole. *Rent-A-Center*, 561 U.S. at 72. A delegation provision may be held invalid for the same reason or reasons

as the arbitration agreement. *Id.* at 74 (stating that if the plaintiff had challenged the delegation provision on the same ground as he challenged the arbitration agreement as a whole, the court would have considered the challenge); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226–27 (3d Cir. 2018) ("In specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions."). Only if the delegation provision is invalid may a court determine for itself whether the entire arbitration agreement is also invalid. *See Rent-A-Center*, 561 U.S. at 71.

It is possible to read the Supreme Court's later decision in *Schein* as overruling *Rent-A-Center*. In *Schein*, the Court held that if an arbitration agreement contains a valid delegation provision, a court must permit the arbitrator to determine the scope of the arbitration agreement, even if the arguments in favor of arbitration are "wholly groundless." 139 S. Ct. at 528. Citing *Rent-A-Center*, 561 U.S. at 69 n.1, the Court wrote:

> This Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by "clear and unmistakable" evidence. *To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.* See 9 U.S.C. § 2. *But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.*

*Schein*, 139 S. Ct. at 530 (emphasis added) (some citations omitted).

Read on its own, the italicized language says that a court must first decide whether the arbitration agreement as a whole is valid. Only after determining that the arbitration agreement is valid may the court assess the validity of the delegation provision. So read, *Schein* reverses the sequence required by *Rent-A-Center*. Despite the clarity of the italicized language, I decline to so read *Schein*. If the Court had intended to overrule *Rent-A-Center*, it surely would have done so explicitly rather than citing the case and then overruling its core holding.

## B.  Terms of the Agreements

The loan and arbitration agreements at issue have materially similar language. The agreements at issue are so similar that the analysis below applies to all of them. I use the Great Plains agreement, signed by plaintiff Novorot, as an example. There are two agreements in the Great Plains agreement—a loan agreement and an arbitration agreement. The arbitration agreement contains a delegation provision.

### 1.  Definition of "Dispute" and Delegation Provision

The arbitration agreement in the Great Plains agreement requires arbitration of any "dispute." "Dispute" is defined broadly to include a controversies with claims based on federal or state law, in addition to controversies with claims based on tribal law:

> **AGREEMENT TO ARBITRATE:**  You and we . . . agree that any Dispute (defined below) will be resolved by arbitration.

> **WHAT ARBITRATION IS:** "Arbitration" is having an independent third-party resolve a Dispute. A "Dispute" is any claim or controversy of any kind between you and us or otherwise involving this Agreement or the Loan. The term Dispute is to be given its broadest possible meaning and includes, without limitation, all federal, state or Tribal Law claims or demands (whether past, present, or future), based on any legal or equitable theory and regardless of the type of relief sought (i.e., money, injunctive relief, or declaratory relief). *A Dispute includes any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate.*

(Bolded emphasis in original; italicized emphasis added.) The italicized last sentence of the second paragraph—the "delegation provision"—assigns to the arbitrator the task of resolving disputes about the validity of the arbitration agreement.

## 2. Choice-of-Law Provisions

Even though a "dispute" is defined as including claims based on federal and state law, five choice-of-law provisions in the loan and arbitration agreements preclude the arbitrator, when deciding a dispute, from applying most federal law and any state law. That is, a dissatisfied borrower may file (indeed, is quite likely to file) a complaint alleging that the lender has violated federal and/or state law. Such a complaint constitutes a "dispute," and the arbitrator is assigned the task of deciding it. However, the choice-of-law provisions limit the law the arbitrator may apply. These

provisions authorize the arbitrator to apply tribal law and small subset of federal law, and preclude the arbitrator from applying most federal law and any state law.

There are two choice-of-law provisions in the arbitration agreement.  The most prominent provides:

> **APPLICABLE LAW . . . THIS AGREEMENT TO ARBITRATE SHALL BE GOVERNED BY TRIBAL LAW.** The arbitrator shall apply Tribal Law and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein.

(Bolded emphasis in original.)  Another, in the previous paragraph, provides:  "The arbitrator has the ability to award all remedies available under Tribal Law, whether at law or in equity, to the prevailing party[.]"

There are three choice-of-law provisions in the loan agreement.  The first is on the first page of the loan agreement.  Under the heading "IMPORTANT DISCLOSURE," it provides:

> **YOU AGREE THAT THIS LOAN IS MADE WITHIN THE TRIBE'S JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW AND NOT THE LAW OF YOUR RESIDENT STATE. . . . YOUR RESIDENT STATE LAW MAY HAVE INTEREST RATE LIMITS AND OTHER CONSUMER PROTECTION PROVISIONS THAT ARE MORE FAVORABLE.  IF YOU WISH TO HAVE**

**YOUR RESIDENT STATE LAW APPLY TO ANY LOAN THAT YOU TAKE OUT, YOU SHOULD CONSIDER TAKING A LOAN FROM A LICENSED LENDER IN YOUR STATE.**

(Bolded emphasis in original.)

The second immediately precedes the agreement to arbitrate. It provides:

**GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate are governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America. . . . Neither this Agreement nor the Lender is subject to the laws of any state of the United States. The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria tribe.

(Bolded emphasis in original.)

The third is at the very end of the loan agreement. The borrower is asked to check a box:

**By checking here and signing below, you understand, acknowledge and agree that**

> **. . . . this Loan is governed by the laws of
> the Otoe-Missouria Tribe and is not
> subject to the provisions or protections of
> the laws of your home state or any other
> state.**

(Bolded emphasis in original.)

Each of the five choice-of-law provisions just quoted provides that tribal law is to be applied in resolving "disputes." Three of them expressly preclude the application of state law. For example, as specified in the loan agreement, the lender is not "subject to the laws of any state of the United States." *But see Martyn v. Leslie*, 137 Cal. App. 2d 41, 57 (Ct. App. 1955) ("[N]o borrower is estopped from asserting usury merely because he has knowingly met the usurious exactions of the lender.").

One of the choice-of-law provisions allows the application of two categories of federal law. The first is federal law that is "applicable under the Indian Commerce Clause." Examples of such law include the Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §§ 2701–2721), at issue in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), and the Indian Child Welfare Act, Pub. L. No. 95-608, 92 Stat. 3069 (1978) (codified as amended at 25 U.S.C. §§ 1901–1963), at issue in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978). The second is federal law to which the tribe voluntarily acquiesced, provided the law is "found expressly applicable to the operations of the Otoe-Missouria tribe." A statute naming the Otoe-Missouria tribe in particular and controlling its operation would certainly be included. It is unclear how far beyond such a law this second

category extends. However, for our purposes it does not matter.

Two things about these references to federal law are important. First, under the principle of *expressio unius est exclusio alterius* (express mention of one item in a class excludes all others in the same class), the arbitrator is allowed to apply only federal law that comes within the two categories mentioned in the choice-of-law provision. The arbitrator is precluded from applying any other federal law. Second, whatever the scope of these two categories of federal law, the two federal statutes at issue in this appeal— the FAA and RICO—are not included.

Consistent with the *expressio unius* principle, the Haynes defendants do not argue that the arbitrator may apply federal law outside these two categories. Rather, they argue that tribal law will provide effective remedies to borrowers. Without citing specific tribal laws, the Haynes defendants argue that it is a "clear and indisputable fact that both Chippewa Cree and Otoe-Missouria law do, in fact, provide Plaintiffs with remedies for their claims." They argue, further, that "the only evidence of the Native American laws presented to the district court definitively showed that the Plaintiffs possess significant remedies under the Native American laws at issue here." Notably, the Haynes defendants nowhere argue or even suggest that tribal law has incorporated the FAA or RICO, or that it contains their functional equivalents. *See Gibbs*, 967 F.3d at 344 ("[E]ven if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law, the rest of the [Tribal] Ordinance fails to clarify how any consumer could meaningfully pursue any claims under it.").

### C.  The FAA's Prospective Waiver Rule

It is established law under the FAA that an arbitration agreement prospectively waiving the right to seek federal or non-federal (including state) statutory remedies is invalid. The prospective waiver rule—or, as it is sometimes called, the effective vindication exception—was first articulated in *Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985).  Plaintiffs brought suit under the antitrust statutes of the United States and of Puerto Rico.  *Id.* at 619–20.  The Court held that an arbitration agreement is enforceable "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum."  *Id.* at 637. The Court elaborated in a footnote, writing in dictum that provisions in an arbitration agreement operating "as a *prospective waiver of a party's right to pursue statutory remedies for antitrust violations*" would be struck down with "little hesitation . . . as against public policy."  *Id.* at 637 n.19 (emphasis added).

In *American Express v. Italian Colors Restaurant*, 570 U.S. 228 (2013), the Court affirmed its earlier dictum. At issue was a class action waiver, which the Court upheld as not inconsistent with "effective vindication" under *Mitsubishi*.  The Court characterized the prospective waiver rule as a "judge-made exception to the FAA."  *Id.* at 235. The Court wrote:

> [T]he exception finds its origin in the desire to prevent "prospective waiver of a party's *right to pursue* statutory remedies," *Mitsubishi Motors*, [473 U.S.] at 737, n.19 (emphasis added).  *That would certainly cover a provision in an arbitration*

> *agreement forbidding the assertion of certain statutory rights.*

*Id.* at 236 (emphasis added).

The plaintiff in *American Express* had contended that the cost of pursuing its case as an individual plaintiff was greater than the likely recovery, and that as a practical matter the class action waiver rendered the statutory remedy ineffective. The Court responded, "[T]he fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* Thus, under *American Express*, if an arbitration agreement renders the vindication of a statutory right impracticable, the prospective waiver rule is not applicable. But if the arbitration agreement prevents a party from vindicating a statutory right by categorically eliminating the right to pursue it, the agreement is an invalid prospective waiver. Though the Court in *Mitsubishi Motors* and *American Express* was dealing with waivers of federal and non-federal statutory rights, the prospective waiver rule, by its logic, should apply to federal and non-federal constitutional and common law rights as well.

D.  Validity of the Delegation Provision and the Arbitration Agreement

As required by *Rent-A-Center*, I first address the validity of the delegation provision. *See* 561 U.S. at 71, 74. I then address the validity of the arbitration agreement as a whole. For the reasons that follow, I conclude that both the delegation provision and the arbitration agreement are invalid.

### 1. Delegation Provision

The delegation provision is a severable agreement that must be specifically challenged. *Rent-A-Center*, 561 U.S. at 72–73 (declining to address the plaintiff's argument that the arbitration agreement as a whole was unconscionable because the plaintiff failed to specifically challenge the validity of the delegation provision); *Swiger*, 989 F.3d at 507 (the plaintiff's failure to challenge the delegation provision specifically prevented court from "reaching the issues addressed in [other rent-a-tribe] cases, where the plaintiffs challenged their delegation clauses."). As required by *Rent-A-Center*, Plaintiffs have specifically challenged the delegation provision, both in the district court and in our court.

Under the choice-of-law provisions in the arbitration and loan agreements, Plaintiffs prospectively waived the application of most federal law and all state law. Absent the choice-of-law provisions, the arbitrator could apply the federal and state law necessary to determine the validity of the arbitration agreement. *See* 9 U.S.C. § 2 (arbitration contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). Federal-law grounds include the FAA's prospective waiver rule. State-law grounds include generally applicable doctrines of fraud, duress, or unconscionability. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Without access to most federal law and any state law, the arbitrator is unable to apply any of these grounds. I need not reach any of the potentially applicable state-law grounds because I conclude the delegation provision is invalid under the federal prospective waiver rule of the FAA.

By severely limiting the federal law the arbitrator may apply, the choice-of-law provisions prospectively waive the application of the FAA's prospective waiver rule, in violation of *Mitsubishi Motors* and *American Express*. *See Am. Express*, 570 U.S. at 236 ("[The prospective waiver rule] would certainly cover a provision in an arbitration agreement *forbidding the assertion of certain statutory rights*." (emphasis added). If the arbitrator were allowed to apply the FAA's prospective waiver rule in determining the validity of the arbitration agreement, the arbitrator would ask whether the agreement impermissibly waives federal and state statutory rights. Those statutory rights include RICO, 18 U.S.C. § 1962 (prohibited activities), and § 1964 (civil remedies), and California's anti-usury statute, Cal. Civ. Code § 1916-2 (maximum interest rate and remedies), § 1916-3 (civil liability). If non-statutory rights are also covered by the prospective waiver rule, state-law rights would include unjust enrichment under California law. *See Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996) (describing the unjust enrichment doctrine). Because the choice-of-law provisions prospectively waive the prospective waiver rule, the arbitrator cannot find the arbitration agreement invalid under either federal or state law. The arbitrator's validity inquiry under the delegation provision is thus illusory, with the foreordained result that Plaintiffs will be required to arbitrate under an agreement that categorically forecloses relief on their federal and state claims.

I therefore conclude under *Mitsubishi Motors* and *American Express* that because the arbitrator cannot apply the FAA's prospective waiver rule in determining the validity of the arbitration agreement, the delegation provision is invalid.

## 2. Arbitration Agreement as a Whole

Because the delegation provision is invalid, a court rather than the arbitrator determines the validity of the arbitration agreement as a whole. My colleagues do not reach this issue because they hold the delegation provision valid. Because I conclude that the delegation provision is invalid, I reach the issue. I conclude that the arbitration agreement as a whole is invalid.

The FAA allows parties considerable freedom to structure arbitration agreements. However, as discussed above, an arbitration agreement may not operate as a prospective waiver, preventing plaintiffs from effectively vindicating their federal or state statutory rights. The choice-of-law provisions, as applied to the arbitration agreement, prospectively waive Plaintiffs' rights under the federal RICO and the California usury statutes, as well as under California's common law unjust enrichment doctrine.

The choice-of-law provisions thus foreclose the application of relevant federal law and of any state law. The loan and arbitration agreements' choice-of-law provisions prevent plaintiff Novorot from arguing that defendants committed federal RICO violations, see 18 U.S.C. § 1962(c) (forbidding a pattern of unlawful debt collection), 1964 (remedies for violations); from challenging the loan's usurious interest rate of 441.38% in violation of California Civil Code §§ 1916-2 (maximum interest rate and remedies), 1916-3 (civil liability); and from claiming that unjust enrichment resulted from the usurious rate. This violates the prospective waiver rule, rendering the arbitration agreements invalid. *See Am. Express*, 570 U.S. at 236.

## E.  The Majority Opinion

My colleagues hold that the delegation provision is valid. The key to their holding is the paragraph that defines "dispute" and contains the delegation provision.  My colleagues conclude that this paragraph authorizes the arbitrator to apply federal law.  They write:

> The plain language of the delegation provision does not foreclose the arbitrator from considering enforceability disputes based on federal law.  The description of what an arbitrator can decide expressly includes enforceability disputes arising under "*federal, state, or Tribal law . . .* based on *any legal or equitable theory*."  This necessarily means that Borrowers' rights to pursue their federal prospective-waiver argument remains intact at this stage of the proceedings and the delegation provision is not facially a prospective waiver.

Maj. Op. at 15 (emphasis in original).

My colleagues misunderstand the paragraph.  For the convenience of the reader, here it is again:

> "Arbitration" is having an independent third-party resolve a Dispute.  A "Dispute" is any claim or controversy of any kind between you and us or otherwise involving this Agreement or the Loan.  The term Dispute is to be given its broadest possible meaning and includes, without limitation, all federal, state or Tribal Law claims or demands (whether past, present, or future), based on any legal or

> equitable theory and regardless of the type of
> relief sought (i.e., money, injunctive relief, or
> declaratory relief).  A Dispute includes any
> issue concerning the validity, enforceability,
> or scope of this Agreement or this Agreement
> to Arbitrate.

This paragraph is simultaneously a definitional provision (defining "arbitration" and "dispute") and a forum selection clause (delegating to an arbitrator the task of deciding "disputes").  It is not a choice-of-law provision.

My colleagues make a fundamental mistake, treating the paragraph as if it were a choice-of-law provision.  It is true that the paragraph defines "dispute" broadly to include controversies based on federal and state claims.  It does so because these are precisely the claims dissatisfied borrowers are most likely to bring when challenging the loan agreements.  The defendants very much wanted such claims to be brought before an arbitrator rather than a court.  But they did not want the claims to be decided under the federal or state law that would provide effective remedies.  They therefore included choice-of-law provisions—*five* of them— in the arbitration and loan agreements, foreclosing the application of all but a small and irrelevant subset of federal law and entirely foreclosing the application of state law.

In their central argument, my colleagues contend that the paragraph defining "dispute" and containing the delegation provision overrides the choice-of-law provisions.  They conclude that because the paragraph defines "dispute" as including claims brought under federal law, the paragraph authorizes the arbitrator to apply federal law.  They write:

> [W]e conclude that the delegation provision
> is enforceable because it does not eliminate

> Borrowers' right *to pursue* in arbitration their prospective-waiver challenge to the arbitration agreement as a whole, *even though that challenge arises under federal law*.

Maj. Op. at 14–15 (second emphasis added). I strongly disagree. The paragraph defines "dispute" as including claims based on federal law, but it does not authorize the application of federal law. My colleagues write, further, that the choice-of-law provisions do not override the "mandate" of the paragraph that the arbitrator apply federal law:

> While the choice-of-law provisions dictating that tribal law governs the parties' relationship could be viewed as conflicting with the delegation provision's plain meaning, they do not defeat its plainly stated mandate that the arbitrator decide arbitrability issues from whatever source they arise.

*Id.* at 16. Again, I strongly disagree. The delegation provision is a "plainly stated mandate" that the arbitrator decide a "dispute," defined as including claims under federal law. But the delegation provision is *not* a "mandate"—let alone a "plainly stated mandate"—that the arbitrator apply federal law.

A simple example will illustrate my colleagues' fundamental mistake. Imagine an arbitration agreement between two parties. One party is French. The other is English. The agreement defines a "dispute" as a disagreement between the parties arising out of a contract between them. One paragraph of the agreement defines

"dispute" as including claims based on any law, including French and English law, and specifies that any dispute is to be decided by an arbitrator. Another paragraph—the choice-of-law paragraph—specifies that the arbitrator is to use German law to decide any "dispute." It is hornbook law that the arbitrator must apply German law, as directed by the choice-of-law paragraph, even if a party seeks to rely on French or English law.

So it is here. The arbitration agreement defines "dispute" as including claims brought under federal or state law. But the choice-of-law provisions of the arbitration and loan agreements specify that the arbitrator is to apply tribal law, and a small and irrelevant subset of federal law, in deciding a "dispute."

In a fall-back argument, my colleagues misread the choice-of-law provision referring to federal law. They contend that the choice-of-law provisions, including this one, allow the arbitrator to apply the full range of federal law. As described above, the second choice-of-law provision in the loan agreement authorizes the arbitrator to apply two categories of federal law specific to Indians. Neither category includes the FAA or RICO. Under the venerable *expressio unius* interpretive principle, the arbitrator may apply only those two categories of federal law.

In an attempt to avoid the force of the *expressio unius* principle, my colleagues quote language from the arbitration agreement. They write that "the arbitration agreement authorizes an arbitrator to decide disputes 'based on *any* legal or equitable theory . . . includ[ing] any issue concerning the validity, enforceability, or scope of . . . [the arbitration agreement].'" Maj. Op. at 19 (emphasis and alterations in original). Therefore, according to my

colleagues, an argument based on the *expressio unius* principle "stretches the Latin beyond reason." The quoted language comes from the paragraph defining "dispute." It does not come from a choice-of-law provision. It in no way suggests that the *expressio unius* principle does not apply to the choice-of-law provision that authorizes the arbitrator to apply two, and only two, categories of federal law.

As noted above, the Hayes defendants do not agree with my colleagues, and have made no arguments that would support their conclusion. The Hayes defendants do not contend that the arbitrator may apply federal law outside the two specified categories of federal law. They contend, instead, that tribal law provides effective remedies to Plaintiffs.

Conclusion

Our sister circuits have consistently condemned the arbitration agreements embedded in tribal internet payday loan agreements, including those used by the very same lenders as in this case. *See Think Finance*, 922 F.3d 112 (2d Cir. 2019). In the words of the Fourth Circuit, payday lenders use these agreements "to avoid state and federal law and to game the entire system." *Hayes*, 811 F.3d at 676. Based on a reading of the arbitration agreement that even the payday lenders have not been willing to advance, my colleagues improperly force vulnerable borrowers into arbitration.

I strongly but respectfully dissent.